**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 182, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, AND HELPERS OF AMERICA, Respondent.**

No. 224, Docket 27524.

United States Court of Appeals Second Circuit.

Argued Dec. 4, 1962.

Decided Jan. 28, 1963.

Norton J. Come, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, James C. Paras and Lee M. Modjeska, Washington, D. C., Attys.), for petitioner.

George Schiro, Utica, N. Y., submitted brief for respondent.

Before LUMBARD, Chief Judge, and SWAN and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

The National Labor Relations Board seeks enforcement of an order, 135 NLRB No. 90, finding that Local 182, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, hereafter the Union or the respondent, violated § 8(b) (7) (B) of the National Labor Relations Act, 29 U.S.C. § 158(b) (7) (B), added by the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, which prohibits "recognitional" or "organizational" picketing within twelve months after a valid election.[1] The order, entered February 5, 1962, required the Union to cease and desist from such picketing (a) "for a period of one year from March 1, 1961", and (b) "where within the preceding twelve months a valid election under 9(c) of the Act has been conducted which the Respondent did not win." We grant enforcement.

Woodward Motors, Inc. (hereafter Woodward, the Company or the employer) is engaged, in upstate New York, in the sale and servicing of automobiles procured from outside the state. On August 1, 1960, the Union informed Woodward that it represented a majority of the Company's employees and requested negotiations. After polling its 15 employees, Woodward, on August 8, recognized the Union as representative of the employees in a specified unit, agreed to enter into negotiations and to establish union shop conditions in the meantime, and further agreed to submit to arbitration the discharge of one Gorecki on August 2. Some seven bargaining sessions were held, without result. On September 21, Woodward received a petition signed by eight of the employees stating that they did "not want to become associated with the Local Teamsters Union" but did "want to form our independent shop union." At the next scheduled bargaining session, Woodward informed the Union that, in the light of the petition, it could not continue to negotiate. On October 5 the Union filed charges alleging violation by the Company of § 8(a) (1), (2), (3) and (5)—because of a refusal to bargain, the discriminatory discharge of Gorecki, and unlawful assistance to the "independent" union. Woodward countered on October 7 with a petition for an election.

---

1. Section 8(b) (7) makes it an unfair labor practice for a labor organization or its agents:

"to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:

"(A) where the employer has lawfully recognized in accordance with this Act any other labor organization and a question concerning representation may not appropriately be raised under section 9 (c) of this Act,

"(B) where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted, or

"(C) where such picketing has been conducted without a petition under sec-

tion 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: Provided, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 9(c) (1) or the absence of a showing of a substantial interest on the part of their labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: Provided further, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.

"Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this section 8(b)."

Beginning on October 10, 1960, representatives of the Union appeared at the entrance to the Company's property, carrying signs that read:

"WOODWARD MOTORS, INC.
UNFAIR LABOR PRACTICE AND
VIOLATION OF AGREEMENT
PICKET LINE
UNFAIR
TO ORGANIZED
LABOR
DO NOT PATRONIZE
TEAMSTERS-CHAUFFEURS
WAREHOUSEMEN & HELPERS
AFL LOCAL 182
UTICA & CENTRAL N. Y. STATE"

The Company, on October 28, filed charges that this picketing violated § 8(b) (7) (C) in that it was for recognitional and organizational purposes and was being conducted when a petition for an election had not been filed within a reasonable period after its commencement. On November 3 the Regional Director accepted a settlement of the Union's § 8(a) (1) and (3) charges with respect to the discriminatory discharge of Gorecki; he later notified the Union he was dismissing its other charges under § 8(a) (2) and (5). The Union appealed to the General Counsel from the dismissal of these charges; the appeal was denied on December 23. Next, on January 6, 1961, the Regional Director dismissed the Company's § 8(b) (7) (C) charge against the Union on the ground that a timely petition for election *had* been filed, to wit, the Company's own petition of October 7, "and a determination has been made that an expedited election should be conducted upon such petition in accordance with the provisions of sections 8(b) (7) (C) and 9(c)."

Picketing stopped on January 16, 1961. At the election, on January 17, no labor organization achieved a majority of the valid ballots. About January 30 representatives of the Union reappeared near Woodward's premises and stationed themselves in autos parked on the shoulder of the adjacent highway, having previously planted two signs in a snowbank abutting the entrance. The first read:

"WE ARE NOT PICKETING FOR
ORGANIZATION OR RECOGNITION."
The second read: 
"THE EMPLOYEES OF WOODWARD MOTORS,
INC., ARE NOT PROTECTED BY A
UNION CONTRACT."

The Union business representative testified that if people inquired of the sign watchers what this Janus-like display was supposed to mean, the watchers "would tell them we had a signed Union agreement with this Company and there are certain things that happened, we had lost the people, some were discharged for unjust cause, some were laid off. There was, in other words, a motive to break the Union I would tell these people." He conceded that if the Union had had a contract with Woodward at the time, "there would be no reason to place a sign out." Mr. Woodward testified that if a truck came along, the Union representatives "would run out, stop it, speak to the driver after which action the driver would always drive away", and that, in general, deliveries were thus interrupted. The Union continued this activity until March 1, 1961, when Judge Brennan granted a temporary injunction under § 10($l$). Finding a violation of § 8(b) (7) (B) by the Union, the Board entered the order described above, which it asks us to enforce.

The Union challenges the order on five grounds. It (1) denies that there was picketing after the election, (2) says that if there was, this did not have the object defined in the introductory clause of § 8(b) (7), (3) claims that any picketing was within the second proviso to § 8(b) (7) (C), which, it asserts, applies also to § 8(b) (7) (B), (4) contends that the election was not "a valid election", and (5) urges finally that the order by its terms is "academic, useless, and illegal".

The Union's first objection, that the post-election activity was not "picketing", is without merit. Webster's New International Dictionary (2d ed.) says that the verb "picket" in the labor

sense means "to walk or stand in front of a place of employment as a picket" and that the noun means "a person posted by a labor organization at an approach to the place of work. * * *" Movement is thus not requisite, although here there was some. The activity was none the less picketing because the Union chose to bisect it, placing the material elements in snowbanks but protecting the human elements from the rigors of an upstate New York winter by giving them the comfort of heated cars until a delivery truck approached; this was still "more than speech and establishes a locus in quo that has far more potential for inducing action or nonaction than the message the pickets convey". Building Service Employers' Int'l Union Local 262 v. Gazzam, 339 U.S. 532, 537, 70 S.Ct. 784, 787, 94 L.Ed. 1045 (1950). At the very least, the Board did not act unreasonably in construing "picket", a statutory term relating to a subject within its area of special competence, to include what the Union did here. N.L.R.B. v. Hearst Publications, Inc., 322 U.S. 111, 130–131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); Packard Motor Car Co. v. N.L.R.B., 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). See also, Comment, Picketing by an Uncertified Union: The New Section 8(b) (7), 69 Yale L.J. 1393, 1395–98 (1960).

■■ There is little more in the Union's second claim, that the post-election picketing did not have as "an object thereof * * * forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative." The Union does not dispute that stopping deliveries would amount to "forcing or requiring" if the other conditions were met; but denies that they were. Professor Cox, who writes with peculiar authority on this subject, says, with respect to the phrases here at issue, "The very few men close to the drafting of the Conference Report who understood this problem had no common intention—perhaps 'had conflicting intentions' would be a better phrase"; he suggests that "The best solution would be to treat the union's objective as a question of fact." 44 Minn.L.Rev. at 266–67. So treating it, we cannot find unreasonable the Board's conclusion that the Union's protest "was directed to the Employer's withdrawal of recognition and discontinuance of bargaining negotiations" and that "Satisfaction of such protest required a renewal of recognition and resumption of negotiations." The Board was not bound to accept at face value the disclaimer on the sign first described; it was entitled to consider the totality of the Union's conduct. See Penello v. Retail Store Employees Local Union No. 692, 188 F.Supp. 192, 201 (D.Md.1960), aff'd, 287 F.2d 509 (4 Cir., 1961). It is true that even the second sign did not contain specific reference to the picketing union, as did the signs in the Penello case, in Kennedy v. Los Angeles Joint Executive Board of Hotel & Restaurant Employees, 192 F. Supp. 339 (S.D.Calif.1961), and in N.L. R.B. v. Local 239, IBT, 289 F.2d 41 (2 Cir.), cert. denied, 368 U.S. 833, 82 S.Ct. 58, 7 L.Ed.2d 35 (1961), but stated only that Woodward's employees "are not protected by a union contract." We assume in the Union's favor, without deciding, that in proscribing picketing whose object is to force or require the employer's recognition of "a labor organization" or the employees' selection of "such labor organization", the statute refers only to the particular labor organization which is doing the picketing, so that § 8(b) (7) would not apply if the object of the picketing was merely to get *some* union into the shop—as, for example, if it were shown here that the Teamsters would have withdrawn their pickets if the Company made a suitable contract with the independent union. No such showing was made, and the Board was warranted —particularly in the light of the timing of the picketing and of the business representative's testimony quoted above—in concluding that recognition or organization of Local 182 as bargaining representative of Woodward's employees was at

least "an" object[2] of the post-election picketing.[3]

Little need be said as to the Union's third objection, namely, that picketing of the sort described in the introductory clause may be conducted, as provided in § 8(b) (7) (C), "for the purpose of truthfully advising the public (including consumers) that an employer does not * * * have a contract with * * * a labor organization", even "where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted", within the terms of § 8(b) (7) (B). The language and structure of § 8(b) (7), its legislative history, its manifest purpose, its administrative construction, and such judicial decisions as have been rendered, unite to negate this reading. See 105 Cong.Rec.App. A7915 (Representative Griffin), App. A8524 (Senator Goldwater), 6656, 17900 (Senator Kennedy), 15540 (Representatives Thompson and Udall), 17883–884 (Senator Morse); Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L.Rev. 257, 260, 265–70 (1959); International Hod Carriers, Local 840, Supplemental Decision and Order, 135 NLRB No. 121, sheet 8 (1962); Cavers v. Teamsters "General" Local No. 200, 188 F.Supp. 184, 190–92 (E.D.Wis.1960); Penello v. Retail Store Employees Local Union No. 692, supra, 188 F.Supp. at 1200; Kennedy v. Los Angeles Joint Executive Board of Hotel & Restaurant Employees, 192 F.Supp. 339, 342 and fn. 2 (S.D.Calif.1961); Graham v. Retail Clerks Int'l Ass'n, Local No. 57, 188 F.Supp. 847 (D.Mont.1960). Congress intended, in Senator Kennedy's words, "to provide that for a certain period of time following a legitimate election, there could not be picketing" of the sort described in the introductory clause. It is thus unnecessary to consider whether the Board was warranted in finding, as it did, that the post-election picketing had the effect of inducing the stoppage of deliveries and services and hence in any event did not meet the standards of the second proviso to § 8(b) (7) (C).

This brings us to the fourth objection: that the election was not a "valid" one, primarily because, as the Union contends, the employer was guilty of unfair labor practices that had not been remedied. It has long been "customary Board policy not to proceed with a representation case while charges are pending against a company or the effects of prior unfair labor practices remain undissipated; employees cannot exercise true freedom of choice in the face of interference or coercion." Cox, Labor Law: Cases and Materials (1958) 341.[4] Although § 8(b) (7) imposes no express

---

2. See Penello v. Retail Store Employees Local Union No. 692, supra, 188 F.Supp. at 199; cf. N. L. R. B. v. Denver Building and Construction Trades Council, 341 U.S. 675, 688–689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); IBEW, Local 501 v. N. L. R. B., 341 U.S. 694, 700, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).

3. Professor Cox's article adds: "Normally recognition or union organization are objectives of any picketing of an unorganized shop, but the force of this presumption, based upon experience, can be dissipated by proof that the labor conditions of which the union complains are presently such a substantial threat to existing union standards in other shops as to support a finding that the union has a genuine interest in compelling the improvement of the labor conditions or eliminating the competition, even though the union does not become the bargaining representative." 44 Minn.L.

Rev. at 267. No such proof was offered here. See also Aaron, The Labor-Management Reporting and Disclosure Act of 1959, 73 Harv.L.Rev. 1086, 1105–06 (1960).

4. The author qualifies this by saying that "the Board may proceed to an election despite pending charges where there is little probability that the alleged unfair practice seriously affected a substantial number of employees," p. 342.
When the unfair labor practice charge is a meritorious one of refusal to bargain under § 8(a) (5), the Board declines to entertain or dismisses the representation petition; when there is a meritorious charge of unlawful interference or discrimination, the Board holds the representation petition in abeyance. International Hod Carriers, Local 840, Supplemental Decision and Order, 135 NLRB No. 121, fn. 24 and 25 (1962).

conditions in this regard, the Board considers that "it strains credulity to believe, that Congress proposed to make the rights of unions and employees turn upon the results of an election which, because of the existence of unremedied unfair labor practices, is unlikely to reflect the true wishes of the employees". International Hod Carriers, Local 840, Supplemental Decision and Order, 135 NLRB No. 121, sheet 15 (1962). In view of the sense of the situation and Congressional acquiescence in the Board's long standing practice, cf. N.L.R.B. v. Gullett Gin Co., 340 U.S. 361, 365–366, 71 S.Ct. 337, 95 L.Ed. 337 (1951), this seems a sound view,[5] at least if limited to practices of a sort that would be likely to prevent a fair election, which evidently is what the Board meant. The Trial Examiner, whose Intermediate Report was approved by the Board, overruled the Union's claim on the basis that here the General Counsel had dismissed the unfair labor practice charges against the employer under § 8(a) (2) and (5), and that the Examiner did "not believe it incumbent upon the trier of the facts in one case to reexamine an administrative determination reached in another case." Although we appreciate the difficulties, which arise from the internal bifurcation of the Board and have led to a similar holding in another context, see Times Square Stores Corp., 79 NLRB 361 (1948), 2 Davis, Administrative Law Treatise (1958), § 13.-05 fn. 24 and 31, we are not sure the issue can always be settled in such summary fashion. Section 8(b) (7) (B) applies only to picketing for the forbidden object within the twelve months after "a valid election". The Board's brief concedes, properly we think, that in an unfair labor practice proceeding under § 8(b) (7) (B), "all questions relating to the validity of the election, including the propriety of directing it, are open to Board and judicial review", citing Department & Specialty Stores Employees' Union, Local 1265 (Kinney Co.), 136 NLRB No. 29 (1962), and Department & Specialty Stores Employees' Union, Local 1265 v. Brown, 284 F.2d 619 (9 Cir., 1960), cert denied, 366 U.S. 934, 81 S.Ct. 1659, 6 L.Ed.2d 846 (1961). As the Board indicated in the Hod Carriers opinion, we cannot suppose that Congress was concerned only with validity in the formal sense, cf. Brown v. Bullock, 294 F.2d 415, 420–421 (2 Cir., 1961); an election in which a union has in fact been strong-armed by tactics violating § 8(a) would hardly be "valid" under § 8(b) (7) (B)—even in the unlikely event that the General Counsel had refused to issue a complaint, and even though the Board could not make him issue one and his refusal would not be reviewable by a court of appeals under § 10(f), Lincourt v. N.L.R.B., 170 F.2d 306 (1 Cir., 1948), and only dubiously so by a district court, Hourihan v. N.L.R.B., 91 U.S.App.D.C. 316, 201 F.2d 187 (1952), cert. denied, 345 U.S. 930, 73 S.Ct. 792, 97 L.Ed. 1359 (1953); Retail Store Employees Union Local 954 v. Rothman, 112 U.S. App.D.C. 2, 298 F.2d 330 (1962). However, a union wishing to argue that an election is invalid because of the employer's unremedied unfair labor prac-

5. We say this although Congress did not adopt a proposal, by Senator Kennedy, making explicit that it should be a defense to any claim of violation of § 8(b) (7) "to show that an unfair labor practice within the meaning of section 8(a) has been committed by the employer", 105 Cong.Rec. 15906, or the modification of that proposal contained in § 708 of S. 1555 as passed by the Senate, see 1 Legislative History of the Labor Management Reporting and Disclosure Act of 1959, 583–84. In the bill as passed, these provisions survived only in the limited form of an amendment to § 10(*l*) saying that the Board's officer or regional attorney "shall not apply for any restraining order under section 8(b) (7) if a charge against the employer under section 8(a) (2) has been filed and after the preliminary investigation he has reasonable cause to believe that such charge is true and that a complaint should issue." The specific prohibition of an application under § 10(*l*) under such circumstances does not mean that unfair labor practices by the employer are irrelevant in all others. See Cox, 44 Minn.L.Rev., supra, at 265, fn. 36.

tices, despite the General Counsel's refusal to act upon its charges, must do more than prove that it has filed charges which the General Counsel has dismissed; there must be something to indicate that he was wrong in doing so and that unfair labor practices in fact prevented a fair election. Here the Union neither proved nor offered to prove anything of the sort; indeed it did not even appeal from the Regional Director's settlement of its § 8(a)(3) and § 8(a)(1) charges relating to the alleged discriminatory discharge, nor from his determination that an election should be conducted upon the Company's petition, see Statements of Procedure, § 101.7 and § 101.23(b).

Another possible flaw in the election is that it was held, purportedly under the authority of the first proviso of § 8(b)(7)(C), as an "expedited" one, "without regard to the provisions of section 9(c)(1)." Section 9(c)(1) directs that when a petition of a specified character has been filed, "the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice"; "if the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof." Although determinations under § 9(c)(1) are

made locally by the Regional Director, Regulations § 102.67(a), there are limited opportunities for review by the Board, § 102.67(b)–(j). All this may be dispensed with, however, if the conditions of the first proviso of § 8(b)(7)(C) are met.[6]

That they were met here might be questioned on two grounds. One arises from the fact that the Company's petition [7] was filed before picketing began rather than "within a reasonable period of time not to exceed thirty days from the commencement of such picketing." This would appear to be at most a formal defect not impairing the validity of an election; we are unable to perceive how anyone's rights were adversely affected by the Board's pinning the election to a petition filed a few days before the start of picketing and allowed to remain on file thereafter, as against the one that could have been filed a few hours after the pickets appeared. The other question stems from the Board's view that "picketing which meets the requirements of the [second] proviso also renders the expedited procedure inapplicable." International Hod Carriers, Local 840, supra, at sheet 7; cf. Reed v. Roumell, D.C., 185 F.Supp. 4. Assuming in the Union's favor the propriety of this reading, which has some textual basis and derives support from the statement of Senator Kennedy in presenting the Conference Report to the Senate,[8] the

---

6. Even under that section, however, the Regional Director may order a hearing if he "believes, after preliminary investigation of the petition, that there are substantial issues which require determination before an election may be held." Statements of Procedure, § 101.23(c).

7. Section 9(c)(1)(B) makes it clear that the representation petition may be filed by the employer.

8. "Organization picketing: The House bill would have forbidden virtually all organizational picketing, even though the pickets did not stop truck deliveries or exercise other economic coercion. The amendments adopted in the conference secure the right to engage in all forms of organizational picketing up to the time

of an election in which the employees can freely express their desires with respect to the choice of a bargaining representative. When the picketing results in economic pressure through the refusal of other employees to cross the picket line, the bill would require a prompt election. Purely informational picketing cannot be curtailed under the conference report, although even this privilege would have been denied by the Landrum-Griffin measure." 105 Cong.Rec. 16413.

The Board's Regulations and Statements of Procedure also accord with the view stated in the text. Section 102.77(b) conditions an expedited election upon the prior filing of a charge of an unfair labor practice under § 8(b)(7); § 101.22(b) says that "If the investigation reveals that there is no merit in the

case is still one where the expedited procedure was proper. For there was ample evidence that the pre-election picketing was not within the second proviso since, as the Examiner found with respect to the post-election activity, "an effect of such picketing" was "to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services." Mr. Woodward testified that during the pre-election period the pickets "marched up and down and if a truck did enter they would stop the truck, stand in front of it and engage the driver in conversation shortly after it came in", with the result that the picketing prevented deliveries of new vehicles, laundry, uniforms, undercoating materials, janitorial supplies, automotive parts—and Pepsi Cola.

We come finally to the respondent's challenge to the order as "academic, useless and illegal". The first two adjectives rest on the fact that the period of one year from March 1, 1961, during which respondent was ordered to cease and desist by subdivision (a) of the order, has expired, as it very nearly had when the order was made.[9] Plainly the order is not academic or useless if we enforce subdivision (b), which forbids picketing for the proscribed object "where within the preceding twelve months a valid election under 9(c) of the Act has been conducted which the Respondent did not win." Respondent claims this to be "illegal", but we do not find it so. "It is a salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful

charge, the regional director * * * dismisses it * * *. However, if the investigation reveals that issuance of a complaint may be warranted but for the pendency of a representation petition involving the employees of the employer named in the charge, action on the charge is suspended pending the investigation of the petition as provided in § 101.23." The latter section says that the petition shall be handled under the expedited procedure when, among other requirements, "(2) picketing of the employer is being conducted for an object proscribed by section 8(b) (7) of the act; [and] (3) subparagraph (C) of that section is applicable to the picketing."

It would seem quite possible, however, to read § 8(b) (7) (C) as saying that "such picketing" means any picketing with the object stated in the introduction to § 8(b) (7), so that even "proviso picketing" with the purpose proscribed in the preamble would trigger the first proviso, relating to expedited elections, although compliance with the second proviso would protect against a finding of an unfair labor practice or an injunction under § 10(l). The expedited election provision was a creature of the Conference Committee—a compromise between the bill passed by the Senate and the bill reported by the Labor Committee of the House, on the one hand, which would have amended § 9 to provide an alternate procedure avoiding a hearing whenever a conference with the Regional Director revealed that "there are no substantial issues of fact or law which

should be resolved by a preelection hearing", S. 1555 as passed, § 705; H.R. 8392 as reported, § 704, and, on the other, the Landrum-Griffin Bill, H.R. 8400, which had no expedited election provision. The difficulty in interpretation arises from the Conference Committee's having inserted the expedited procedure in § 8 rather than amending § 9. Hence it can be contended that the expedited procedure is unauthorized in the absence of conduct by the union that would constitute an unfair labor practice (or would have constituted one but for the filing of a petition) and, on the other hand, that Congress meant to authorize the expedited procedure whenever there was picketing of the sort described in the introductory clause of § 8(b) (7), thereby permitting an early election and a consequent end to any organizational picketing—by recognition of the union if it won the election or under § 8(b) (7) (B) if it lost. On the latter construction it would be immaterial whether the pre-election picketing here, which clearly had the proscribed "object," was within the second proviso of § 8(b) (7) (C).

9. Since respondent has made no complaint on this score, we do not pass on the propriety of the Board's policy of prohibiting picketing for twelve months from the date when picketing ceased, rather than from the certification of the results of the election. Compare Retail Store Employees' Union, Local 692 (Irvins, Inc.), 134 N.L.R.B. No. 53, sheet 7 (1961).

acts \* \* \*. Having found the acts which constitute the unfair labor practice the Board is free to restrain the practice and other like or related unlawful acts." N.L.R.B. v. Express Publishing Co., 312 U.S. 426, 436, 61 S.Ct. 693, 699, 700, 85 L.Ed. 930 (1941). But even if subdivision (a) stood alone, the mere lapse of time would not render the proceeding moot. A direction to enforce the Board's order necessarily connotes judicial approval of its findings and conclusions that respondent's conduct violated § 8(b) (7), which are essential to its validity, and this might furnish "reasonable cause to believe" under § 10(*l*) with respect to subsequent picketing of the same general nature by the Union against the Company. See N.L.R.B. v. American Nat'l Ins. Co., 343 U.S. 395, 399 fn. 4, 72 S.Ct. 824, 96 L.Ed. 1027 and cases cited (1952); N.L.R.B. v. Pure Oil Co., 103 F.2d 497 (5 Cir., 1939). Compare N.L.R.B. v. Cosmopolitan Studios, Inc., 291 F.2d 110, 112 (2 Cir., 1961). Cf. 5 U.S.C. § 1004(d).

Enforcement granted.