NATIONAL LABOR RELATIONS BOARD, Petitioner,

and

Kansas Color Press, Inc., Intervenor,

v.

LAWRENCE TYPOGRAPHICAL UNION NO. 570 a/w International Typographical Union, AFL–CIO, Respondent.

No. 8851.

United States Court of Appeals Tenth Circuit.

April 28, 1967.

Rehearing Denied June 12, 1967.

---

6. Neely v. Martin K. Eby Construction Co., 386 U.S. 317, 87 S.Ct. 1072, 1081, 1084, 18 L.Ed.2d 75 (U.S. March 20, 1967) (Black, J., dissenting).

See also 10 Cir., 356 F.2d 58.

George B. Driesen, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Paul J. Spielberg, Washington, D. C., on the brief), for petitioner.

George Kaufmann, Washington, D. C. (Gerhard P. Van Arkel, Washington, D. C., and Stanley D. Rostov, Kansas City, Mo., on the brief), for respondent.

Before LEWIS, BREITENSTEIN and HICKEY, Circuit Judges.

DAVID T. LEWIS, Circuit Judge.

This troublesome case presents several complex issues involving the scope and construction of section 8(b) (7) (B) of the National Labor Relations Act,[1] relevant portions of which provide that it shall be an unfair labor practice for a labor organization:

"(7) to picket or cause to be picketed * * * any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees * * * unless such labor organization is currently certified as the representative of such employees:

* * * * * *

"(B) where within the preceding twelve months a valid election under section 9(c) [29 U.S.C. § 159(c)] has been conducted * * *."

Pursuant to section 10(e) of the Act,[2] the National Labor Relations Board petitions for enforcement of its order entered upon findings that picketing by respondent Union of Kansas Color Press, Inc. at Lawrence, Kansas is an unfair labor practice as defined by section 8(b) (7) (B). The order directs respondent, among other things, to cease and desist from such picketing for a period of twelve months and to post customary notices. No jurisdictional question is presented.

Respondent was the recognized bargaining agent for composing room and mailing room employees of Kansas Color

1. As amended by the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act) § 704(c), 73 Stat. 542, 544, 29 U.S.C. § 158(b) (7) (B).

2. 29 U.S.C. § 160(e).

Press[3] when its collective bargaining contract expired on May 31, 1961. After negotiations for a new contract were unsuccessful, respondent called a strike on September 19, 1961 and commenced picketing the Company's plant with "On Strike" signs. While efforts to negotiate a satisfactory contract continued, the Company maintained production by gradually replacing the strikers with transfers from other departments and with new employees. The new employees were considered by the Board to have been hired with the understanding that their jobs would be permanent.

In January 1963, petitions to decertify the Union were filed with the Board in behalf of the strike replacements. The Union then filed charges of unfair labor practices against the Company alleging that it had refused to bargain in good faith and had initiated the filing of the decertification petitions. After an investigation, the Regional Director and General Counsel found the evidence of Company unfair labor practices insufficient to warrant issuance of a complaint and the Union's charges were thereupon dismissed. At a subsequent hearing on the decertification petitions, the Union unsuccessfuly attempted to reopen the investigation into its charges of unfair labor practices. The Regional Director sustained the hearing examiner's ruling that such charges are not properly litigable in a representation proceeding, found that a question of representation existed, and directed that an election be held in a unit of composing room and mailing room employees. The Union then sought without success to litigate the matter in federal district court through an action for a declaratory judgment and injunction against the holding of the election. See Lawrence Typographical Union v. McCulloch, D.D.C., 222 F.Supp. 154, remanded with instructions to dismiss for lack of jurisdiction, 121 U.S.App.D.C. 269, 349 F.2d 704.

The election was held on August 28, 1963. The Union challenged the ballots of the strike replacements on grounds that the Company had committed unfair labor practices affecting the outcome of the balloting, this time adding that the Company had offered the strike replacements super-seniority. The Union also alleged that the strike replacements were merely temporary employees who had taken the jobs of unfair labor practice strikers. The challenge was formally rejected by both the Regional Director and the Board,[4] and on August 3, 1964, based upon a count of votes cast by the replacements, the Regional Director certified that the Union was no longer the bargaining representative of the Company's composing room and mailing room employees.

The Union continued its picketing in spite of the decertification and the Company immediately filed charges that the picketing was in violation of section 8(b) (7) (B) of the Act. A complaint issued and a hearing was conducted where the Union again attempted to probe the invalidity of the election through charges of Company unfair labor practices and the temporary status of the strike replacements. The trial examiner ruled the Union's evidence inadmissible and rendered a decision finding the Union in violation of the Act. But before the Board itself could pass on the merits of the trial examiner's decision, the Court of Appeals for the District of Columbia, in ordering that the Union's previous suit for declaratory judgment and injunction be dismissed for lack of jurisdiction, stated that "since a decertification election is not valid if the employer initiated it, the Board must hear evidence on the issue before it issues a cease and desist order under § 8(b) (7) (B)." 349 F.2d at 708. See also Lawrence Typographical Union No. 570 v. Sperry, 10 Cir., 356 F.2d 58. The Board then remanded the case to the trial examiner with di-

---

3. Hereinafter referred to as "the Company." It appears as intervenor but has not filed a brief or presented oral argument.

4. The Regional Director by letter invited counsel for the Union to elaborate on the specific charges made in the Union's challenge of the ballots, but there was no response.

rections to reopen the record and take evidence on the Union's charges of the Company's refusal to bargain in good faith and instigation of the filing of de-certification petitions. The Board declined, however, to permit trial of the super-seniority and status-of-voters issues on the ground that they had already been considered and rejected as without merit. After further hearings, the trial examiner issued a supplemental decision finding that there had been no refusal to bargain and no instigation of filing petitions on the part of the Company, and that the election was therefore valid. He then reaffirmed his earlier decision finding the Union in violation of section 8(b) (7) (B) of the Act. The findings and recommendations of the trial examiner were subsequently adopted by the Board.

### I.

Respondent's threshold contention is that the Board's order is unenforceable because respondent was not afforded an opportunity to litigate its unfair labor practice charges against the Company in the pre-election representation hearing. As hereinafter discussed, we consider such an argument to be an attempt to avoid the ultimate consequences of time-honored and judicially approved Board election procedures by assertion of a right that plainly does not exist.

■■ We recognize as well settled the Board's rule that when an employer instigates an election petition the election proceedings will be dismissed. Sperry Gyroscope Co., Div. of Sperry Rand Corp., 136 N.L.R.B. 294, 297. So, too, is it settled that a striker rather than his replacement is eligible to vote in any election if the strike is in protest of an employer's refusal to bargain or other unfair labor practice. But respondent has already discovered in Lawrence Typo-

graphical Union v. McCulloch, 121 U.S. App.D.C. 269, 349 F.2d 704, that the Board violates neither a clear mandate of the Act nor the Constitution when it refuses to hear evidence of unfair labor practices in representation proceedings. And inasmuch as the *McCulloch* decision is particularly applicable here, we limit our concern to the narrow question of whether the language in section 9(c) (1) of the Act [5] requiring the Board to conduct "an appropriate hearing" prior to certification or decertification of a bargaining representative should be *construed* to include a hearing on charges of unfair labor practices. As we have already indicated, we think the answer is plainly negative.

■■■ The Board is endowed with a wide degree of discretion in the establishment of representation procedures. N. L. R. B. v. A. J. Tower Co., 329 U.S. 324, 330, 67 S.Ct. 324, 91 L.Ed. 322. Consistent with the statutory scheme giving General Counsel "final authority" to investigate charges and issue complaints [6] and with the congressional purpose to have representation questions speedily resolved,[7] the Board has exercised its discretion by requiring that unfair labor practice charges affecting elections be litigated in unfair labor practice proceedings. Union Mfg. Co., 123 N.L.R.B. 1633; Times Square Stores Corp., 79 N.L.R.B. 361. And while, as respondent insists, the Board may yet be consistent with the processes and purposes of the Act by admitting into a representation hearing evidence of unfair labor practices,[8] nothing in section 9(c) (1) or in any other part of the Act need be construed as compelling it to do so. Indeed, to so circumscribe the Board's discretion in this area would be to read into the Labor Act a requirement that is expressly negated by section 5 of the Administrative Procedure Act, 5 U.S.C. § 1004,

---

5. 29 U.S.C. § 159(c) (1).

6. § 3(d) of the Act, 29 U.S.C. § 153 (d).

7. See discussion of legislative history in Boire v. Greyhound Corp., 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849.

8. See, e. g., Consolidated Blenders, Inc., 118 N.L.R.B. 545; Gold Bond, Inc., 107 N.L.R.B. 1059.

which excludes "the certification of employee representatives" from its provisions for the conduct of administrative hearings.

The discretion to define and impose representation procedures necessarily contemplates a discretion to define and impose the investigatory bounds of "an appropriate [representation] hearing." This works no undue hardship on the parties because neither the direction of an election nor the certification or decertification of a bargaining representative effects a final Board adjudication of the election's validity. Cf. American Federation of Labor v. N. L. R. B., 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347. Such an adjudication is exclusively within the purview of a post-election or post-certification unfair labor practice proceeding where statutory procedural safeguards are clear and subject to direct enforcement in the courts. Thus, as noted in the *McCulloch* decision:

"A decertification order would not become 'effective' until unfair labor practice proceedings in which decertification was relevant were brought. Decertification is only a declaration by the Board that the union no longer represents a majority of the employees. A decertified union is not subject to governmental sanctions until it is found to have committed an unfair labor practice. Since unfair labor practice charges under § 8(b) (7) (B) depend on the existence of 'a valid election', and since a decertification election is not valid if the employer instigated it, the Board must hear evidence on instigation before it issues a cease and desist order under § 8(b) (7) (B). National Labor Relations Board v. Local 182, Internat'l Brotherhood of Teamsters [etc.,] 314 F.2d 53 (2d Cir. 1963)." 349 F.2d at 708.

We turn therefore to whether the respondent Union was given an adequate opportunity to probe the existence of "a valid election" in the proceedings brought against it under section 8(b) (7) (B). See N. L. R. B. v. Ideal Laundry & Dry Cleaning Co., 10 Cir., 330 F.2d 712.

## II.

By the time respondent was charged with committing an unfair labor practice, it had submitted to the Board four separate allegations, any one of which, if proved, would have dictated a finding that the election was not in fact a valid one or at least that its results were not validly certified. These were: .

(1) that the Company had instigated the filing of the decertification petitions;

(2) that the Company had prolonged the strike by refusing to bargain in good faith;

(3) that the Company had given the strike replacements only temporary employment; and

(4) that the Company had offered the strike replacements super-seniority.

As mentioned previously, the Board remanded the case to the trial examiner for hearings on Company instigation and refusal to bargain after the Court of Appeals for the District of Columbia handed down its decision in Lawrence Typographical Union v. McCulloch, supra. Evidence of the temporary status of replacements and offers of super-seniority, however, was not permitted to be heard.[9] We think it appropriate that each allegation and the applicable limitations imposed by the Board on respondent's presentation be considered seriatim.

*Company instigation.*—On the basis of testimony given at the second hearing by the individual strike replacements who had filed the decertification petitions, the Board found that the filings had been made without any sponsorship, suggestion or assistance on the part of

---

9. These latter two allegations, which must be considered alternatively because of the obvious conflict between them, were not submitted by the respondent until after the election and apparently were thus not a part of the record in the *McCulloch* case.

the Company.[10] Respondent, however, urged that because of minor inconsistencies in the accounts given, the witnesses' testimony should have been altogether discredited. Apparently, respondent now concedes that the deference owed by a reviewing court to a fact finder's credibility resolution protects this finding from reversal. N. L. R. B. v. Champa Linen Service Co., 10 Cir., 324 F.2d 28. On the other hand, it suggests by implication that the finding cannot be probative of the crucial issue of election validity because the hearing was held almost two and one-half years after respondent originally sought to litigate the issue. We fail to comprehend the connection between this argument and the dispositive aspect of the Board's finding which negatives the precise allegation advanced. Suffice it to say that respondent was allowed a full and fair hearing on the matter and substantial evidence supports the finding made by the Board.

*Refusal to bargain.*—If respondent could have shown that the Company had prolonged the strike by an illegal refusal to bargain, the strikers would have been entitled to have their votes counted as unfair labor practice strikers and the votes of the strike replacements would have thus been rejected. But in its order remanding the proceedings to the trial examiner, the Board restricted the proof to a showing that "the alleged unlawful refusal to bargain * * * occurred within the Section 10(b) limitations period preceding the filing of charges." Respondent was thus restricted to a showing that the Company's refusal to bargain occurred no more than six months prior to the date when respondent originally filed that charge with the Board. It now urges that such a restriction was unreasonable and contrary to law. We disagree. As respond-

ent recognizes in its brief, "the issue here is one of voting eligibility which is normally determined in representation proceedings." We are back then in the area where the discretion of the Board in defining its bounds of inquiry is extremely broad. While the six-month limitation provided by section 10(b) certainly does not compel a rule of evidence, N. L. R. B. v. American Aggregate Co., 5 Cir., 305 F.2d 559, 563, we cannot say that the Board abuses its discretion by using it as such when voter eligibility claims are founded on stale charges of employer unfair labor practices. See Local Lodge No. 1424, International Association of Machinists v. N. L. R. B., 362 U.S. 411, 419–429, 80 S.Ct. 822, 4 L.Ed.2d 832. The situation is no different in principle from that in which unfair labor practice strikers, having failed to file timely charges of employer misconduct that allegedly precipitated or prolonged their strike, are denied an opportunity to litigate their right to reinstatement once the strike is over. Greenville Cotton Oil Co., 92 N.L.R.B. 1033, aff'd sub nom. American Federation of Grain Millers v. N. L. R. B., 5 Cir., 197 F.2d 451. We conclude, therefore, that the evidentiary restrictions placed upon respondent in its attempt to show an unlawful refusal to bargain were clearly reasonable and according to law.[11] In addition, the finding of the Board that the Company had not engaged in any conduct during the relevant period constituting an unlawful refusal to bargain is amply supported by the record.

*Status of replacements.*—In its postelection challenges, respondent urged that because of certain conduct during the course of the strike indicating an intent on the Company's part to treat the strikers as permanent employees, the Board

10. The principal reason for the filings was, according to the witnesses, fear that a settlement between the Company and the Union would prejudice their jobs.

11. The record indicates that respondent was in fact permitted to introduce *for*

*background purposes* evidence of the Company's refusal to bargain even though such refusals allegedly occurred more than six months prior to the filing of the charge.

should have ruled that the strikers, rather than their replacements, were the eligible voters.[12] The Board, through its Regional Director, rejected the argument out of hand, apparently on the theory that respondent's evidence was insufficient in law to overcome the Board presumption favoring replacements over strikers in elections held after an economic strike has been in progress for more than twelve months. Pacific Tile & Porcelain Co., 137 N.L.R.B. 1358, 1360. See also section 9(c) (3) of the Act, 29 U.S.C. § 159(c) (3); Boire v. Miami Herald Publishing Co., 5 Cir., 343 F.2d 17, 22–24, cert. denied 382 U.S. 824, 86 S.Ct. 56, 15 L.Ed.2d 70.[13] The presumption was bolstered here, says the Board, by the fact that some replacements were recruited through advertisements offering permanent employment and by the fact that many replacements had been on the job for almost two years prior to the election. In the subsequent unfair labor practice proceedings, the Board refused to admit evidence on the employment-status question on grounds that respondent's position had already been fully considered and rejected as without merit. Relying upon this court's decision in N. L. R. B. v. Ideal Laundry & Dry Cleaning Co., 330 F.2d 712, respondent insists that such a restriction on its presentation was error.

In *Ideal Laundry*, the Board deferred resolution of certain fact issues relating to the size of an appropriate bargaining unit until after an election, and then refused to permit a hearing on those issues in both the post-election certification proceedings and the unfair labor practice proceedings. We held that:

"Due process demands that either party be permitted to produce additional proof deemed material to the vital issue of appropriateness, if it was not a part of the record in the representation proceedings, and for some reason was unavailable for consideration by the Board in its decision therein.

\*　\*　\*　\*　\*　.　\*

"While the Board, may, in the exercise of its administrative discretion, deny an opportunity for hearing in the representation proceedings on evidence elicited by a post-election investigation, respondent is entitled to produce in this unfair labor practice proceedings any additional, relevant evidence bearing upon the critical issue." 330 F.2d at 716.

But as we later recognized in N. L. R. B. v. Dewey Portland Cement Co., 10 Cir., 336 F.2d 117, 119–121, the *Ideal Laundry* rule has some obvious limitations. Thus, where the factual allegations which form the basis of respondent's legal conclusion stand undisputed and the record shows that the Board has considered those allegations, weighed them against other undisputed facts, and within the limits of its discretion reasonably refused to be swayed from a contrary legal conclusion, there is no due process compulsion to go through the motions of an evidentiary hearing. See, e. g., N. L. R. B. v. Dewey Portland Cement Co., supra; N. L. R. B. v. National Survey Service, Inc., 7 Cir., 361 F.2d 199, 204–207; N. L. R. B. v. Sun Drug Co., 3 Cir., 359 F.2d 408; N. L. R. B. v. Air Control Products of St. Petersburg, Inc., 5 Cir., 335 F.2d 245; and authorities cited. Here, through evidence of conduct during the course of an economic strike, respondent seeks to probe de novo the imperspicuous fact of an employer's subjective intent. While under different circumstances evidence might be pertinent to later inquiry, we think the Board could nevertheless here

---

12. The conduct cited was (1) a willingness to reinstate some of the strikers even though it would have required the Company to lay off some of the replacements, (2) failure to pay the strikers accrued vacation benefits, and (3) failure to notify the strikers that they had been permanently replaced.

13. The presumption works to the striker's benefit if the election is held within twelve months from the beginning of an economic strike.

properly continue to conclude that, as of election day,[14] the replacements were permanent. Accordingly, owing to the nature of respondent's allegation and its offer of proof, the Board's refusal to conduct an evidentiary hearing did not constitute error.

*Offers of super-seniority.*—In addition to allegations affecting the status of employees, respondent also alleged in its post-election challenges that the election was invalid because the Company had offered super-seniority to the strike replacements. See N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308. This too was rejected by the Board without a hearing in both the post-election certification proceedings and the subsequent unfair labor practice proceedings. Here the Board relies upon the rule announced in Ideal Electric Mfg. Co., 134 N.L.R.B. 1275, that makes misconduct occurring prior to the filing of an election petition irrelevant to the determination of whether an election should be set aside. See also Goodyear Tire & Rubber Co., 138 N.L.R.B. 453. The purpose of the rule, according to the Board, is to eliminate from post-election consideration conduct too remote to have prevented the free choice guaranteed by section 7 of the Act.[15] Thus, a union may not be heard to complain after losing an election that, prior to the filing of election petitions, the employer made ominous predictions of what might happen if he had to enter into collective bargaining. In such a case the Board may reasonably assume that by the time the election is actually held the coercive effects of the misconduct have dissipated. But this reasoning is manifestly inapplicable to the circumstances at bar. An offer of super-seniority is not the kind of unfair labor practice that dissipates in its coercive effects over a relatively short period of time. In *Erie Resistor,* for example, the Court cited with approval a Board assessment of the practice which included:

"Super-seniority renders future bargaining difficult, if not impossible, for the collective bargaining representative. Unlike the replacement [of strikers] * * * which ceases to be an issue once the strike is over, the plan here creates a cleavage in the plant continuing long after the strike is ended. Employees are henceforth divided into two camps: those who stayed with the union and those who returned before the end of the strike and thereby gained extra seniority. This breach is re-emphasized with each subsequent layoff *and stands as an ever-present reminder of the dangers connected with striking and with union activities in general.*" 373 U.S. at 231, 83 S.Ct. at 1147. (Emphasis added.)

We think super-seniority may also be viewed as a continuing inducement for non-strikers to bring down a striking union through a decertification election, especially where it is reasonable to assume that a strike settlement would otherwise bring about an elimination of the preference.[16]

While in some cases there may be equitable considerations reasonably constituting a bar to litigation of the question,[17] no such considerations are present here. Respondent has submitted a substantial and material allegation of fact which, if proved, would compel a finding that the election was invalid and thus that no unfair labor practice has been committed

14. Voter Eligibility depends upon circumstances existing as of the date of the election. W. Wilton Wood, 127 N.L.R.B. 1675.

15. 29 U.S.C. § 157.

16. See note 10 supra.

17. A union that allows election petitions to be filed with knowledge that strike replacements have been offered super-seniority may be held to have waived the charge as a defense to a post-certification unfair labor practice. Here, however, the Board does not dispute respondent's statement that it learned for the first time of such offers only after the Board had already directed the holding of an election.

under section 8(b) (7) (B) of the Act. The Board limited its inquiry on this issue in the first instance to two employees hired after the decertification petition had been filed and has never subsequently given consideration to the Union's claims in totality. The Board's rejection of the issue at the unfair labor practice hearings was not leveled at lack of specificity in the claims but was premised upon tardiness. As we have indicated, a promise of super-seniority has a continuing coercive effect, and when discovered after an election has already been set, as is here claimed, it must be given full consideration. We must accordingly conclude that the Board erred in refusing to grant a hearing on the matter prior to its issuance of the cease and desist order and for that reason the petition for enforcement will be denied.

### III.

Assuming that notwithstanding the issue of super-seniority the record will ultimately show the undisputable validity of the election, we proceed to respondent's contention that lawful economic picketing by an incumbent union cannot be transformed by decertification into unlawful recognitional picketing proscribed under section 8(b) (7). Such a result is dictated, it is urged, by uniform application of a decision construing section 8(b) (7) (C) where the Board held that picketing by an incumbent union in support of its contract demands is not converted into recognitional picketing when strikers are replaced and the employer doubts the union's continuing majority. Warehouse Employees Union No. 570, (Whitaker Paper Co.), 149 N.L.R.B. 731. We think it clear, however, that whereas an employer's mere doubts cannot legally affect a union's representative status, a valid decertification election certainly can. After decertification, a former incumbent occupies no better position than the union which has, through a Board election, sought and failed to have itself accepted *initially* as the bargaining representative.

Here respondent admitted that the object of its continued picketing was to get a contract. Under the circumstances existing after August 3, 1964, such object could not possibly have been achieved without new recognition from the Company. See Centralia Building & Construction Trades Council v. N.L.R.B. 124 U.S.App.D.C. 212, 363 F.2d 699, 701; N.L.R.B. v. Local 182, International Brotherhood of Teamsters etc., 2 Cir., 314 F.2d 53, 58; and authorities cited. And aside from the obvious inferences to be drawn from respondent's admission, we think it inescapable that a withholding of the protections and sanctions of the Act solely because of a former bargaining status, in the words of the trial examiner,

> "would invite a losing incumbent union to resort to such picketing as a pressure tactic to wrest the representative status and recognition which it was denied by the employees' freely expressed choice at the ballot box, would unstabilize the situation for a period of 12 months during which no new election could be held in accordance with Section 9(c) (3), and would subvert and nullify the very purpose for which Section 8(b) (7) (B) was enacted."

We conclude that the continued picketing by respondent Union within twelve months after a valid decertification election was for a recognitional object and therefore would be a violation of the Act.

### IV.

Premised on the fact that the twelve-month period of grace following decertification has long since expired, respondent's final argument is that the Board's cease and desist order transcends the purpose of section 8(b) (7) (B) and violates the free-speech protections of the First Amendment. We see no merit to

the argument. When the results of the election were certified by the Board, respondent had open to it two courses of action: (1) abide by the results and withdraw from picketing for twelve months, or (2) continue picketing and attempt to have the election set aside through defense of an unfair labor practice charge. In choosing the latter course, respondent effectively tolled the running of the period of stability afforded by section 8(b) (7) (B). Assuming failure in its defense of unfair labor practice charges, we consider it unsupportable for respondent to insist now that the period of stability elapsed during the course of this litigation and that respondent is therefore no longer subject to any sanctions under the Act. Such a narrow view of section 8(b) (7) (B) is in essence a view that renders it a legal nullity.

Nor do we perceive in the Board's remedy any problems of constitutionality. Suffice it to say that, under all the facts and circumstances of this case, respondent's continued picketing may be viewed as one of those "isolated evils" which the 1959 amendments to the Labor Act were intended to prevent and which are not otherwise protected by the First Amendment. Cf. N.L.R.B. v. Fruit & Vegetable Packers and Warehousemen, Local 760 (the *Tree Fruits* case), 377 U.S. 58, 62–71, 84 S.Ct. 1063, 12 L.Ed.2d 129. An order requiring respondent to cease and desist from the unfair labor practice found for a period of twelve months is perfectly consistent with the specific language of section 8(b) (7) (B) and certainly well within the broad powers of the Board to fashion remedies which will effectuate the purposes and policies of the Act.

The Board's order is vacated and the case remanded for a hearing on the respondent's charge that the Company offered super-seniority to its strike replacements.