Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of National Labor Relations Board, Petitioner,

v.

HEMPSTEAD LOCAL NO. 1921, UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, AFL–CIO, Respondent.

Civ. No. 60–C–361.

United States District Court E. D. New York.

May 5, 1960.

Jacques Schurre, Washington, D. C., for petitioner.

Bernard Hall, East Meadows, N. Y., for Spar Builders, Inc. and others.

Delson, Levin & Gordon, New York City, for respondent, Ernest Fleischman and Aaron Weissman, New York City, of counsel.

ZAVATT, District Judge.

The National Labor Relations Board through its Regional Director petitions this court pursuant to section 10($l$) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160($l$) for an order restraining the respondent from picketing during the pendency of related matters currently before the Board. The petition alleges violations of sections 8 (b) (4) (A) and (B) by means proscribed in both (i) and (ii) of paragraph (4) of the act, 29 U.S.C.A. § 158(b) (4) (i) (ii) (A), (B), and the separate violation of section 8(b) (7) (C) of the act, 29 U.S.C.A. § 158(b) (7) (C).

The issue in proceedings of this kind is merely whether the Board has "reasonable cause" to believe that an unfair labor practice has been committed. The evidence adduced at the hearing tended to establish these facts:

Spar Builders, Inc., Puritan Homes, Inc., and P & S Building Corp., are three related corporations (hereafter referred to in the aggregate as "Spar") engaged in the construction of seventeen homes in East Meadow, Long Island, a development known as "Concord Estates." The estimated cost of construction is $340,000. It is stipulated by the parties that Spar is engaged in commerce. Spar has let out work to several subcontractors including Merrick Utility Associates, Inc., ("Merrick") for installation of water mains; L & P Stair Corp., ("L & P") for installation of stairs; Cary Insulation Co., Inc., ("Cary") for installation of insulation. The carpentry work was let to Russell and Robert Benson, and John and William Halloran, collectively doing business as "R & B Brothers," a partnership (referred to hereafter as

"Benson"). Benson has no employees. It is stipulated that they are not engaged in commerce to a sufficient degree to come within the Board's current jurisdictional standard. Benson is not a member of any union. That fact gave rise to the current dispute which developed through these events:

Some time in early February, 1960, William Vance, business agent of the respondent (a labor organization within the meaning of the act) discovered that nonunion help was being used on the job. On about February 23 Vance had a conversation with Paul Weissbluth, an executive officer of Spar. There is agreement that the conversation concerned the nonunion status of Benson. It appears further, although there is some conflict in the testimony, that Vance threatened to picket the job unless Benson joined the union and hired four additional union carpenters. No agreement was reached at this meeting. The next morning they met again. Vance now modified his demand. If Benson joined the union and hired only one additional union carpenter, the union would be satisfied. In this vein, Weissbluth offered to pay half of Benson's initiation fee. He also agreed to speak to Benson, and Vance agreed to return the next day for their answer. At their third meeting the next morning, Weissbluth informed Vance that he had been unsuccessful in persuading Benson. However, he suggested that Vance himself speak to Benson about the plan. On this note the meeting ended. Benson remained firm, however, and on February 27 the picketing began.

The picketing has at all times been confined to the sidewalk adjacent to Spar's combination model house and rental office. The one road into the development, by which all supplies and workmen enter, is at right angles to this sidewalk and passes immediately to the left of the model house. However, the pickets do not cross the road as they parade; nor do they otherwise physically obstruct the delivery of supplies or the movement of employees. During the week there are one or two pickets; on the weekends there may be half a dozen. They have conducted themselves peaceably. The sign they carry reads:

CONCORD
ESTATES
Paul Weissbluth Employs
NON-UNION
Carpenter Contractors

"Concord Estates" and "Non-Union" are considerably larger than the other words.

Several weeks after the picketing began employees of Merrick walked off the job. At about the same time employees of L & P and Cary refused to come onto the site. In addition, because various truck drivers have respected the picket line, Spar has had to deliver its own supplies or arrange for delivery either before the pickets arrive in the morning or after they leave at night. As a result, the water main installation has been delayed and the project in general has not reached the state of completion anticipated. On the other hand, Benson has continued to work without appreciable interruption, as have the other nonunion elements at the site: Spar's employees, consisting of an office girl, a maintenance man, and a night watchman, and the independent real estate salesmen, who are on commission.

In pertinent part section 8(b) (4) reads:

"It shall be an unfair labor practice for a labor organization or its agents—

\*     \*     \*     \*     \*     \*

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use \* \* \* or otherwise handle or work on any goods \* \* \* or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is

"(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by section 8(e);

"(B) forcing or requiring any person * * * to cease doing business with any other person * * *."

■ On this recital of the evidence and the law it is clear that an object of the picketing was to have Benson join the union, or failing that, to have Spar hire a union contractor in Benson's stead. These are proscribed objects and coupled with the means used to achieve them, the Board has reasonable cause to believe that section 8(b) (4) (A) and (B) have been violated in the respects specified in both (i) and (ii) of paragraph (4). N. L. R. B. v. Denver Bldg. & Constr. Trades Council, 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; N. L. R. B. v. United Constr. Workers, 4 Cir., 198 F.2d 391, certiorari denied, 1956, 344 U.S. 876, 73 S.Ct. 170, 97 L.Ed. 678; cf. N. L. R. B. v. Associated Musicians, 2 Cir., 1955, 226 F.2d 900, certiorari denied, 1956, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483.

The respondent levels a fusillade of objections to this conclusion:

■ 1. Since Benson is not in commerce the Board has no jurisdiction over activity directed at them by the respondent.

The short answer to this objection is that there is no requirement that Benson be in commerce, at least so far as the 8(b) (4) unfair labor practices are concerned, only that Benson be in an "industry affecting commerce." This characterization might conceivably change from situation to situation but in their relation to Spar at this job, Benson affects commerce within the meaning

of the act. And, of course, that goes for the other subcontractors at the job site.

■ 2. Spar and Benson are "allies."

Assuming that the doctrine, if applicable, would insulate the respondent, the facts do not warrant its application. See McLeod v. Local 810, D.C.E.D.N.Y.1960, 182 F.Supp. 552. The relation of contractor-subcontractor does not by itself invoke the doctrine. See N. L. R. B. v. Denver Bldg. & Constr. Trades Council, supra.

3. Benson are employees of Spar.

Again assuming that the establishment of this fact would protect picketing at the site, there is hardly a scintilla of evidence to support this characterization. On the other hand the evidence of a partnership and self-employed status seems clear and convincing.

4. The Board has misconceived the nature of the picketing:

(a) The object was a pre-hire and "hot cargo" contract with Spar.

This defense is based on recently added sections 8(e) and (f) of the act, 29 U.S.C.A. § 158(e), (f), which, broadly speaking, exempt the building and construction industry and related craft unions from the "closed shop" prohibition found in section 8(a) (3) and 8(b) (2) of the act, 29 U.S.C.A. §§ 158(a) (3), (b) (2), and from the general hot cargo prohibition found in section 8(e) itself. Of course, these amendments only make such agreements lawful, they do not say that picketing to acquire such a contract is a protected activity. The "legislative history" cited by the respondent specifically recognizes this distinction as to hot cargo contracts:

"[W]e left it open as to whether they could strike or picket [the contractor] to compel him to enter into such an agreement. Whatever the courts decide under existing law on [this] question will be applicable to the building-construction industry." [1]

1. 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, page 1830 (magazine interview with Michael Bernstein, Esq.

printed in the Congressional Record as "extension of remarks" of Sen. Goldwater).

■ Assuming that a union may engage in primary picketing to obtain either a pre-hire or a hot cargo contract, it still does not avail the respondent because the issue here is not whether any picketing for those objects is lawful, but rather the narrow issue of whether secondary picketing is. On this point the same "authority" just quoted said: "[The unions] can't engage in secondary boycotts as far as the construction industry is concerned. Those are outlawed completely."[2]

■ Another complete answer is that, even assuming that such objects would be lawful, the Board still has reasonable cause to find that the picketing had other proscribed objects. It is not the law that a valid object insulates unlawful objects, but rather that one bad object taints the valid ones. See N. L. R. B. v. Associated Musicians, supra.

(b) The picketing was directed at consumers and not at employees or employers, be they primary or secondary.

The short answer here is similar to the last one just given on the question of pre-hire and hot cargo contracts. The more complete answer requires the distinguishing of the case of N. L. R. B. v. Business Mach. Mechanics Conference Bd., 2 Cir., 1955, 228 F.2d 553, certiorari denied, 1956, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483.

Undoubtedly that case does hold that consumer picketing under the facts presented in that case was protected. But those facts are not our facts. There the picket sign was clearly addressed to customers, and the employees who might nevertheless read the sign were relatively unorganized and therefore apt to disregard its "pendent" appeal. These facts constituted evidence that the union did not intend to induce secondary pressure by employees.

In the instant case the sign was not so specific in its appeal and the employees of the subcontractors, members of various craft unions, would refuse to perform their services, or so it could be anticipated. See N. L. R. B. v. Associated Musicians, supra, 226 F.2d at page 904.

The petition also alleges a violation of section 8(b) (7) (C) of the act. However, since the Board has already sustained its burden on the 8(b) (4) charges and the same overt activity of the respondent is alleged as to both provisions, it is hardly necessary to discuss the intricacies of this new section.

■■ There remains the question of the scope of the injunction. The respondent relied most heavily on its contention that its picketing was consumer-directed. Such appeals, if they can be dissected from the means and ends proscribed in section 8(b) (4) are valid. See N. L. R. B. v. Business Mach. Mechanics Conference Bd., supra. The particular facts of this case indicate that picketing exclusively for this immediate purpose would be possible and I think an order can be drawn with this in mind that will clearly define the scope of permissible activity and not put the respondent unduly at its peril in keeping within the injunction. It should be remembered that an injunction is a drastic remedy and that this proceeding is merely preliminary to the main event before the Board. The order to be settled herein will enjoin picketing at the site at all times except on Saturdays and Sundays between the hours of 10 a. m. to 8 p. m. The permitted picketing shall be solely for the purpose of advising potential purchasers that Benson is a nonunion carpentry subcontractor.

Settle an order consistent with this opinion within 10 days.

2. 2 id. at page 1829. See also 2 id. at page 946, House Conference Rep. No. 1147, 86th Cong., 1st Sess., p. 42 (1959) U.S.Code Cong. and Adm.News 1959, p. 2514: "[N]othing in [section 8(f)] is intended * * * to authorize the use of force, coercion, strikes, or picketing to compel any person to enter into such prehire agreements."