Samuel M. **KAYNARD**, Regional Director of Region 29 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

**LOCAL 25, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Respondent.**

No. 73–C–1725.

United States District Court, E. D. New York.

Dec. 19, 1973.

Stephen E. Appell, Brooklyn, N. Y., for petitioner.

Delson & Gordon, New York City, for respondent; Ralph P. Katz, Richard Brook, New York City, of counsel.

Fine, Tofel & Saxl, New York City, for General Contractors; Joel A. Reiss, New York City, of counsel.

BARTELS, District Judge.

This case presents the question as to whether peaceful picketing of a job site allegedly for the sole purpose of informing the public that an employer is paying substandard wages and benefits, can be temporarily enjoined on the ground that it also constitutes, in fact, a secondary boycott or an inducement to strike in furtherance of a jurisdictional dispute.

The case is before the Court on petition of the Regional Director of Region 29 of the National Labor Relations Board ("the Board"), pursuant to § 10(*l*) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(*l*) ("the Act"), for a temporary injunction

pending the final disposition of the matters involved herein pending before the Board on charges filed on November 12, 1973. The complaint was filed by Charlane Electric Co., Inc., doing business as Unity Electric Co. ("Unity"), alleging that respondent, Local 25, International Brotherhood of Electrical Workers, AFL–CIO ("Local 25"), has engaged in unfair labor practices within the meaning of § 8(b)(4)(i)(ii)(B) and (D) of the Act,[1] which sections proscribe secondary boycotts and threats, and strikes or inducements to strike in furtherance of, or support of, jurisdictional disputes.

The Board maintains that in accordance with the provisions of § 10(*l*) a temporary injunction must be granted because there exists reasonable cause to believe that picketing engaged in by Local 25 between November 12 and November 26, 1973, was an unfair labor practice in violation of the Act. Local 25 denies the existence of reasonable cause to believe that such picketing was for any other purpose than the permissible one of informing the public that the electrical workers employed by Unity were receiving wages and benefits below the standard wages and benefits received by other electrical employees performing similar work in the same area. The following facts appear to be undisputed:

(1) Local 25, an unincorporated association, is an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work. It maintains its principal office at Pinelawn Road, Melville, New York, and at all times material herein has been engaged within this judicial district in transacting business and in promoting and protecting the interest of its employee members.

(2) Highland Construction Corporation ("Highland"), a New York corporation, maintains its principal place of business at 29 North Mall, Plainview, New York, and places of business at various construction sites, where it is engaged in the business of general construction contracting. During this year Highland purchased lumber, steel, hardware, and other products, valued in excess of $50,000, directly from firms located outside the State of New York.

(3) Unity, a New York corporation, maintains its principal place of business at 2386 Hempstead Turnpike, East Meadow, New York, and places of business at various construction sites, where it is engaged in the business of electrical subcontracting in the construction industry.

(4) Since on or about May 21, 1973, Highland has performed as general con-

---

1. Section 8(b)(4)(i)(ii)(B) and (D) of the Act reads as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

. . . . .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, . . . *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

. . . . .

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work: . . . ."

tractor for the construction of a restaurant building to contain two restaurants, Coco's and Plankhouse, at the Lake Grove Shopping Center, Smithtown, New York ("Highland site"). On June 1, 1973, Highland entered into a subcontract with Unity, under which Unity is to perform all the electrical work at the restaurant-building site. Unity's employees are represented for purposes of collective bargaining by Local 363, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 363"). Unity was until November 14, 1973, covered by a contract with Local 363. The parties are presently negotiating a new labor contract.

(5) Highland directly employs carpenters at the job site, who are represented by the Brotherhood of Carpenters. It also employs one laborer, who is represented by the Laborers Union, at the job site. Highland additionally has engaged union subcontractors to work at the job site. In this case the subcontractors were Unity; Samuel Vernick and Sons, Inc., plumbing contractors, with employees represented by the Plumbers Union; S & S Automatic Sprinkler Co., Inc., sprinkling-system contractors, with employees represented by the Steamfitters; Triple-S Sheet Metal Co., Inc., sheet-metal contractors, with employees represented by Local 55, Sheet Metal Workers; Spring Glen Concrete Corp., concrete contractors, with employees represented by the Cement Mason union; RBR Excavating Corp., excavation contractors, with employees represented by the Operating Engineers; and H. Klein & Sons, Inc., roofing contractors.

(6) Employees of the various employers, including Unity, began working at the Highland site on or about June 4, 1973, and continued to November 12, 1973.

(7) Beginning about 7:30 A.M. on November 12, 1973, Local 25 placed five pickets on Nesconset Highway and Collectors Road, which are roughly parallel and which border the Highland job site. The signs read:

TO THE PUBLIC

ELECTRICIANS
Working On This Job
for UNITY ELEC. CO.
Do Not Receive
Wages and Working Conditions
As Good As Those
Established in Contracts of
LOCAL UNION 25
International Brotherhood of Electrical Workers

———

This Sign Is Not Directed To Any Other Employer or Employee On This Job

———

AFL–CIO

The pickets were about ten feet from the job site, on the sidewalk. None were located on Moriches Road, which is from where the workers at the job site enter and leave. Highland does not have access to the Moriches Road approach, but the employees come through there, by the bank, to park their cars in the bank parking lot. The employees at the site do not report to work through Nesconset Highway or Collectors Road, because the site is under construction and they could not drive through. People drive and walk by the site on Nesconset Highway or Collectors Road.

(8) On each workday between November 12th and 26th, 1973, Local 25 picketed the Highland site, using the same signs throughout.

(9) As a result of such picketing, the employees of Highland and all subcontractors other than Unity refused to cross the picket lines and perform services for their employers at the Highland site.

(10) On November 26th Highland caused Unity to suspend its operations on the Highland site.

(11) On the same day employees of several of the subcontractors returned to

work. Within the next few days all the employees returned.

(12) The wages and benefits paid members of Local 363 are lower than those paid Local 25 and lower than those that are paid electrical workers under Government contracts in this area pursuant to regulations promulgated under the authority of the Davis-Bacon Act, 40 U.S.C. § 276a et seq. and are substandard for the Nassau-Suffolk area.

As indicated previously, the crucial question is whether there is reasonable cause to believe that Local 25 has engaged in the activities proscribed in § 8(b)(4)(i)(ii)(B) and (D) of the Act, wherein one of the objects of Local 25 in engaging in such activity was (1) to force and require Highland and other persons to cease doing business with Unity; (2) to force its subcontractors and other persons to cease doing business with Highland; or (3) to force and require Highland to assign the performance of electrical service work at the Highland site to individuals who are members of or who are represented by Local 25.

To determine this issue, hearings were held on December 5, 6 and 7, 1973, at which evidence was adduced by representatives of Highland, the president of Unity and representatives and an officer of Local 25. Accordingly, the Court makes the following findings of fact:

### Findings of Fact

Viewing the activities of Local 25 in the framework of its activities at other job sites, we find that in the late spring or early summer of 1973, Local 25 picketed with informational placards at the construction site of the Roslyn Americana Hotel, Roslyn, New York, where Unity was employed as a subcontractor. After the employees of the other subcontractors refused to cross the picket lines of Local 25, the general contractor replaced Unity with a Local 25 subcontractor.

During August, 1973, Local 25 picketed with informational signs the construction site of the Marine Midland Bank, Babylon, New York, where Unity was employed as a subcontractor. Unity did finish its work at the Babylon site by working at times when the employees of the other trades were not working. However, Unity's subcontracts with the same contractor, Montana Construction Co., to build at two other Marine Midland sites in Oakdale and Wyandanch, New York, were cancelled and Unity's assignments were taken over by Local 25 subcontractors.

In August or September, 1973, Unity was under contract to install electrical work at the Hicksville, New York post office for J. Gross Construction Corp. ("Gross"). At a conference with Gross, Unity's subcontract was cancelled because according to the head of Gross, he "was getting too much flak or pressure" from the AFL-CIO Building Trades Council, of which Local 25 was a member. The Building Trades Council is an organization composed of representatives of a number of unions in the construction field for the purpose of exchanging information among its members and for the purpose of engaging in joint political action.

To some extent Local 25 and other unions have according to Joseph Cavanagh, business manager of Local 25, "reciprocating picket lines for wages and so on."

The newspaper of Local 25 "The Conduit" in its October, 1970 issue gives instructions concerning union member participation on picket lines which it states to be the strongest tool "we have to maintain area standards and to sustain our progress increasing these standards. We must be willing and EAGER to use this tool whenever and wherever our wages and conditions are threatened by unscrupulous employers." Above this instruction appears a picketer carrying a sign reading "RESPECT A UNION PICKET LINE".

In this particular case the first contacts between Local 25 and Highland occurred in June and in late July, 1973, when Fred Kerbs, a business representative of Local 25, visited the Highland site for the purpose of taking photographs to ascertain the stage of progress of work on the job site and for a seminar offered by the union on the subject of area standards of the benefits and wages of electrical employees. On both occasions John Melkun, Jr., job superintendent at the Highland site, approached Kerbs and inquired as to the reasons for his presence at the site. At the first meeting Kerbs stated that he was just looking.

At the July meeting Kerbs stated that Local 25 was having trouble with Unity "because they weren't Local 25" and that something would have to be done about it. At that time John Melkun, Jr. informed Kerbs that he would try to straighten the matter out. Kerbs added that he would deny that this conversation took place if anything ever came of it. At an accidental third meeting a few days after the July encounter, at a Sears Roebuck store near the Highland site, Kerbs asked John Melkun, Jr. if Melkun had heard anything and Melkun replied in the negative.

On August 6th or 7th Kerbs again came to the job site for the same purposes as in his first two visits. At this meeting he mentioned to John Melkun, Jr. that Local 25 was picketing Unity in Babylon and that he had picket signs in the trunk of his car. He further stated that he did not want to "hurt" Highland by putting up a picket line because the situation with Unity had not been resolved, but he said "if I have to, I will."

After the work at the Highland site had progressed, Local 25, on November 12, 1973, picketed the job site with informational picket signs. Fifteen minutes after picketing began at the Highland site on November 12, 1973, a representative of the Laborers Union and a delegate of the Sheetmetal Workers Union were seen at the Highland site talking to members of their respective unions. The picketers at the Highland site were instructed orally and in writing to say nothing to anyone other than directing people who asked questions to read the signs worn by the picketers. Accordingly, at no time did Local 25 officials or picketers even speak to any employee of Highland other than Melkun, Jr., to Unity or its employees or to any of the subcontractors working at the Highland site or their employees with respect to its picketing at the Highland site. On the other hand, Local 25 made no effort outside of its wording of the picket signs to prevent the employees of the other trades from walking off the job.

Local 25 never picketed Unity's primary place of business in East Meadow or the office of Local 363. All picketing took place at construction sites.

One of the purposes of the picketing by Local 25 was to inform the public that Unity was paying wages and benefits that were substandard for the Nassau-Suffolk area. Local 25 was very concerned with the problem of substandard remuneration to electrical workers not belonging to its local.

### Conclusions of Law

It is well recognized that in determining whether a temporary injunction pursuant to § 10(l) of the Act should issue, the Court has no authority or responsibility to decide whether in fact an unfair labor practice, such as a secondary boycott, has been committed. McLeod v. Local 25, International Brotherhood of Electrical Workers, 344 F.2d 634 (2d Cir. 1965). The only issue raised is whether the Regional Director had "reasonable cause to believe" that the charge that an unfair labor practice had been committed, was true and that a complaint should issue. If the Court finds the existence of such "reasonable cause to believe," then it has jurisdic-

tion to grant such injunctive relief as it deems just and proper. "In determining the objectives of Local 25, the Board is entitled to look to the totality of the union's conduct, and it is not bound by the union's signs or professed object in picketing. See NLRB v. Local 182, Int'l Bro. of Teamsters, etc., 314 F.2d 53, 58 (2d Cir. 1963); Brown Transport v. NLRB, 334 F.2d 30, 38 (5th Cir. 1964). The fact that the union might have had other, valid reasons for picketing—e. g., to enforce area standards—does not absolve it from having an illegal objective." N.L.R.B. v. Local 25, International Brotherhood of Electrical Workers, AFL–CIO, 383 F.2d 449, 453 (2d Cir. 1967). And this test is also applicable in determining "reasonable cause to believe." It is unquestionable that a union has a right without violating the Act to picket for the *sole object* of truthfully advising the public that some employer is operating under substandard working conditions. Centralia Building and Construction Trades Council v. N.L.R.B., 363 F.2d 699, 701 (D.C.Cir.1966); see also § 8(c) of the Act.[2]

■ The issue in this case is whether Local 25 had as its sole objective the publication of the fact that Unity was paying wages below the area standard, or whether it also had the additional objective of inducing or encouraging the employees of other subcontractors at the construction site to refuse to perform services, thus resulting in the assignment of the electrical work at the job site to Local 25 instead of Local 363. We cannot look into the minds of the officers of Local 25 to ascertain their intent, but we can examine the history of and the circumstances surrounding Local 25 picketing at job sites and draw reasonable inferences therefrom. See N.L.R.B. v. Local 25, International Brotherhood of Electrical Workers, AFL–CIO, *supra.* Local 25 does not contest the claim that its picketing had the effect of inducing or encouraging the employees of other subcontractors at the Highland site to refuse to perform services and to leave the site at the time the informational picketing took place, and it does not deny that they did so leave. It does deny that Local 25 intended this effect by the use of its informational pickets. However, the mere disclaimer by the union of any intent to obtain jurisdiction over Unity's employees or to force the prime contractor to employ subcontractors who in turn would engage employees of Local 25, does not prevent a finding to the contrary. Sachs v. Plumbers Local Union No. 5, 307 F. Supp. 190, 194 (D.D.C.1969).

■ We find from the evidence adduced at the hearing that there is reasonable cause to believe, as distinguished from a mere assertion by the Board, that Local 25 picketing involved an objective other than informing the public that Unity paid area substandard wages and benefits. It is true that in the case of pure informational picketing, concurrent or ancillary fallouts may result, including stoppage of work by other unions, even though such result may not have been the objective of the picketing since stoppage could result from the illegal conduct of the other unions. But when a pattern develops indicating that every time informational picketing is resorted to by Local 25 at a job site against Unity it is followed by work stoppage by the employees of the subcontractors, it is reasonable to infer that one of the objectives of the picketing is a secondary boycott in violation of § 8(b)(4) of the Act. Such results occurred after picketing at the Babylon and Roslyn job sites. The above inference is supported by the fact that the union's business representative Kerbs indicated that he did not want to "hurt" Highland by putting up a picket line be-

---

2. Section 8(c) reads:
   "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

cause of Unity but "if I have to, I will." The ordinary informational picket line is not in the same category as a picket line that is used by unions for organizational or representational objectives, which picket line is generally respected. But it is reasonable to assume that an informational picket line would not "hurt" anyone and certainly need not be respected. Yet in Local 25's newspaper "The Conduit," the Local suggests that such a picket line should be respected. Moreover, Joseph Cavanagh, business manager of Local 25, testified that to some extent Local 25 and other unions had "reciprocating picket lines for wages and so on," although he later attempted to emasculate this assertion. Here we have not only informational picketing but informational picketing *plus*. Highland and its subcontractors, as well as the members of Local 363, are being coerced by the picketing which is depriving Highland of its freedom of contract and the members of Local 363 of their option to remain in that local since their jobs are jeopardized by cancellation of or interference with contracts of their employer. See, e. g., N.L.R.B. v. Denver Building and Construction Trades Council et al., 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed.2d 1284 (1951); Highway Truckdrivers and Helpers, Local No. 107, I.B.T. (Riss & Co., Inc.), 130 N.L.R.B. 943 (1961), aff'd, N.L.R.B. v. Highway Truckdrivers & Helpers, Local No. 107, 300 F.2d 317 (3d Cir. 1962); Catalina Island Sightseeing Lines, 124 N.L.R.B. 813 (1959).

For the above reasons, the Court believes that there is reasonable cause to believe that one of the objectives of the informational picketing by Local 25 at the Highland job site was to effectuate a secondary boycott against Highland and to compel an assignment of electrical work from Local 363 to Local 25. Therefore, it hereby enjoins Local 25 pending the final disposition of the matters involved before the Board, from any and all picketing at the site of the con-

struction of a restaurant building located at Lake Grove Shopping Center, Smithtown, New York, called the "Highland site." So ordered.