COORDINATING COMMITTEE STEEL COMPANIES et al., Plaintiffs,

v.

UNITED STEELWORKERS OF AMERICA, Defendant.

Civ. A. No. 77–861.

United States District Court,
W. D. Pennsylvania.

July 29, 1977.

Leonard Scheinholtz, Scott F. Zimmerman, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiffs.

Carl B. Frankel, Pittsburgh, Pa., Michael H. Gottesman, Bredhoff, Gottesman, Cohen & Weinberg, Washington, D. C., for defendant.

## OPINION

SNYDER, District Judge.

Plaintiff Steel and Iron Ore Companies have brought this action for a Temporary Restraining Order, Preliminary and Final Injunction, and money damages against the United Steelworkers of America (Steelworkers) with whom the Companies have negotiated Basic Labor Agreements (BLAs) covering approximately 330,000 employees in the steel industry and approximately 17,- 500 employees in the iron ore industry. Through the Coordinating Committee Steel Companies (CCSC) the Steel and Iron Ore Companies bargained with the Steelworkers regarding wages, hours of work, and other terms and conditions of employment for employees represented by the Steelworkers. Jurisdiction of this Court is asserted under Section 301 of the Labor Management Relations Act of 1947, as amended (29 U.S.C. § 185). Hearing was held on the Preliminary Injunction.[1]

In 1974, the Steel Companies entered into BLAs with the Steelworkers which continue unchanged until August 1, 1977. The parties also agreed to continue until 1977 an Experimental Negotiating Agreement (ENA–77) which provided for binding interest arbitration[2] as the substitute for the

---

[1]. Since the hearing on the Temporary Restraining Order was after notice and full participation by the Defendant, the Court treated the matter as an Application for Preliminary Injunction, with the consent of counsel.

[2]. "Interest arbitration" is a term of art referring to arbitration not for the purpose of determining rights under the present contract or what the terms of that contract mean but rather for the purpose of determining what the terms and benefits should be in a *future* con-

right to strike or lockout as the terminal method of resolving collective bargaining matters, except those defined as local collective bargaining issues in Section D–5–a [3] or those excluded from strike or lockout by Section D–6. In effect, ENA–77 looked forward to a resolution of all contract issues by April 15, 1977, and such issues not so resolved would be submitted to final and binding arbitration. On March 1, 1977, CCSC, on behalf of the Iron Ore Companies, made the ENA–77 and the Basic Steel Settlement Agreement (Settlement–77) binding upon the Iron Ore Companies under the terms of the "Memorandum of Agreement, 1977 Iron Ore Negotiations". The expressed purpose and intent of ENA–77 was to prohibit industry-wide strikes, to achieve stability in the steel industry and to avert the strike-hedge steel inventory buildup and increased foreign steel imports which had preceded negotiations in the steel industry from 1959 (when the last industry-wide strike occurred) until 1973 (when the parties first utilized the Experimental Negotiation Agreement approach as a means of resolving collective bargaining issues).

An examination of the ENA–77 reveals that there was to be no strike, work stoppage or concerted refusal to work in support of the Union's collective bargaining demands in the 1977 negotiations and the Plaintiff Companies agreed not to lockout their employees to support their contract bargaining positions; each party agreed that binding arbitration, rather than economic warfare, would be the method used for resolving disputes. An important exception to the express provision against strikes, stoppages or concerted refusals, however, is the provision in Subsection D–5. This exception relates to issues denominated as "local collective bargaining issues" which are defined as "an issue entered at plant level, proposing establishment of or change in a condition of employment at that particular plant" which would not (1) be inconsistent, involve any additions to, or modifications of, the company agreement, (2) be an arbitrable grievance under the applicable basic labor agreement, and (3) relate to a grievance settlement or arbitration award (pertaining only to arbitrable grievances).

ENA–77 then provided in Section D–5–b–(3) [4] a requirement that the parties make

tract. *See, Elgin, J. & E. Ry. Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

**3.** Section D–5–a defines Local Collective Bargaining Issues as:

"A local collective bargaining issue is an issue entered at plant level, proposing establishment of or change in a condition of employment at that particular plant which:

(1) would not, if adopted, be inconsistent with any provision of a company agreement (as defined below) or involve any addition to or modification of any such provision or agreement;

(2) would not be an arbitrable grievance as defined in the applicable basic labor agreement; and

(3) does not relate to a grievance settlement or an arbitration award; provided, however, this subparagraph (3) does not apply to nonarbitrable grievances.

Subparagraph (2) above shall not exclude an issue which involves a local agreement or practice relying for enforceability on Section 2–B of the basic labor agreements between the United States Steel Corporation and the Union and its counterpart provisions in the agreements of the other Companies.

The term 'company agreement' means any basic labor agreement and all related appendices, understandings, or agreements, including those covering pensions, insurance, SUB or SVP, which contain the kinds of provisions, although not in identical language, included in such agreements between the International Union and the United States Steel Corporation. Any provision of a company agreement that is solely applicable to a particular plant and is not the kind of provision contained in such agreements between the International Union and the United States Steel Corporation shall not be considered part of a company agreement for the purpose of this definition."

**4.** Section D–5–b–(3) provides as follows:

"Procedure for disposition

The parties shall make every effort to settle local collective bargaining issues and in order to achieve this objective shall proceed as follows:

\*　　\*　　\*　　\*　　\*　　\*

(3) Should any such issue or issues initiated by the Union remain unresolved as of June 10, 1977, the Union Co-Chairman shall decide whether the issue or issues shall be withdrawn or put to a secret ballot vote available to all employees at that plant as defined in Appendix

every effort to settle the local bargaining issue by negotiation, but absent agreement by June 10, 1977, and if not withdrawn by the Union Co-Chairman, the issue would be submitted to a secret ballot strike vote of all employees at the involved plant. If the Local votes to strike, the Co-Chairman submits the matter to the International President, who must decide whether or not to authorize the strike by July 15, 1977.

The Union strongly urges that this "local issue" exception was a quid pro quo for its acceptance of interest arbitration. Before ENA, the Union could not strike at the plant level in support of local bargaining issues. Either the Union would strike industry-wide, or it could not strike at all. Consequently, pursuit of many local issues was frustrated by the bargaining structure because the Locals could not succeed in generating nation-wide enthusiasm for local problems. Thus, while on one hand ENA protects against industry-wide strikes and the disastrous consequences incident there-

to, on the other hand it creates a new concept of local strikes to support local bargaining issues.

Pursuant to the terms of ENA–77, CCSC and the Steelworkers engaged in separate negotiations with the local representatives of the Union on local issues. Further, each Iron Ore Company was represented on an "Iron Ore Committee" of the CCSC which negotiated with the Steelworkers to resolve matters related primarily to the iron ore operations of such Company.

On April 9, 1977, an agreement was reached on all basic collective bargaining agreement issues and the Steelworkers and the CCSC entered into the Settlement–77, pursuant to which the 1974 BLAs between the Steelworkers and the Companies were, by incorporating negotiated changes, modified to become the new BLAs dated August 1, 1977. Part of the Settlement–77 provided for renewal of the binding interest arbitration agreement through the 1980 negoti-

A, who worked or were on vacation in the last pay period closed on or before June 10, 1977. Such election, to be valid, must take place no later than June 30, 1977. Every such eligible employee shall be entitled to a ballot furnished by the International Union and appropriate ballot boxes, properly supervised, will be made available for the casting of such ballots. Such ballots shall be collected and counted by tellers selected in conformance with International Union procedures. If a majority of those voting vote in favor of a strike, and if the matter is not otherwise resolved, the matter shall no later than July 8, 1977 be referred by the Union Co-Chairman to the President of the International Union along with a request for permission to strike the plant in which the issue or issues originated. His decision on the request for permission to strike shall be forwarded in writing to the Union Co-Chairman with a copy to the Company Co-Chairman not later than July 15, 1977. Should permission to strike be granted by the President of the International Union, he shall at the same time specify the date on which the strike, it if is to occur, must commence, which shall not be earlier than the first scheduled turn of August 1, 1977, and such strike shall be confined to the plant where the issue or issues originated and as defined in Appendix A. The right to strike pursuant to permission granted by the President of the International Union shall automatically be canceled and the issue between the parties deemed resolved if the strike does not commence on the first scheduled turn of the date specified by the

President of the International Union except as the parties at the International-Company level shall agree to another date.

Should any local collective bargaining issue or issues initiated by a Company remain unresolved as of June 10, 1977, the Company shall decide whether the issue or issues shall be withdrawn or become the basis for a lockout at the plant involved. The requirements as to timetable and date of commencement of any lockout by any Company shall be the same as those set out above for strikes over local collective bargaining issues, as more specifically set forth in the balance of this paragraph. The Company's decision shall be forwarded in writing to the Union Co-Chairman not later than July 15, 1977. Should the Company decide to lockout at a plant in support of a local collective bargaining issue or issues, the notice shall specify the date on which the lockout, if it is to occur, must commence, which shall not be earlier than the first scheduled turn of August 1, 1977, and such lockout shall be confined to the plant where the issue or issues originated and as defined in Appendix A. The right to lock out shall automatically be canceled and the issue between the parties deemed resolved if the lockout does not commence on the first scheduled turn of the date specified in the notice except as the parties at the International-Company level shall agree to another date. Any such strike or lockout shall cease upon the resolution of the local collective bargaining issue or issues because of which such strike or lockout commenced."

ations (ENA–80). Pursuant to the Settlement–77, some of the negotiated changes took effect May 1, 1977.

As contemplated by ENA–77, after settlement of all of the industry-wide issues, the negotiations continued on a multitude of local issues. By June 10, 1977, the date by which local unions were either to withdraw unresolved local demands or call a strike vote under ENA–77, all but 38 plants had completely settled their differences. Of the 38 plants taking strike votes, 33 Locals voted to strike in support of their still unresolved demands and were authorized to strike by Lloyd McBride, President of the International. The strike date for most plants is August 1, 1977. Of these 33 locations, 12 were basic steel plants or steel subsidiaries and 21 were ore mining operations. Since the strike votes and authorizations, negotiations have continued and all of the basic steel plants and all but three of the steel subsidiaries have reached agreements. Although negotiations are still in progress, Union officials believe there is little doubt that most of the remaining Locals will strike on August 1, 1977.

Thus, ENA–77 has effectively accomplished successful negotiations involving all but about 17,000 of the 350,000 employees at CCSC members' facilities without economic warfare, and the threat of an industry-wide strike has been averted in 1977. From the outset of negotiations, however, one dispute has stymied the complete success of ENA–77. The local unions have entered demands at the local level and pursued them even after Settlement–77, which the Companies strongly assert are not properly "local collective bargaining issues" as defined in D–5 of ENA–77. They argue that some issues pressed at the local level would either be inconsistent with, modify or add to, Settlement–77, and that others are susceptible to arbitration under the existing applicable BLAs. They fear that if such issues can be pushed at the local level, the steel industry will be subjected to a "double jeopardy" in bargaining issues; first at the industry-wide level and then be required to deal with the same issues at the local level. Also, if non-local issues become strike matters in 1977, other Locals will be less restrained from striking over non-local issues in the 1980 negotiations, and the Companies' customers will lose faith in the ability of ENA to avoid nationwide strikes in the steel industry and will once again build up steel inventories with foreign steel in "strike" years, to the detriment of CCSC members. Thus, the whole purpose of ENA would be defeated, injuring the interests of both the Companies and the Union.

The Steelworkers just as strongly urge that they have entered only local issues into the local plant negotiations and that the Companies are attempting to deprive them of their right to strike over issues to which they are entitled under ENA–77. They insist that their right to strike over such issues is fundamental to their participation in ENA and that any restraint of this right will lead to the demise of ENA.

The negotiation process has failed to resolve this dispute, and the Union has declined the Companies' offer to arbitrate the question of which matters are local and which are not. Hence, the Companies have turned to the Court to enjoin the authorization of strikes and order the Union to arbitrate.

## DISCUSSION

■ At the outset, the Court notes that its jurisdiction to enjoin union strikes is severely limited by the Norris-LaGuardia Act, Section 4 (29 U.S.C. § 104), which provides:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as those terms are herein defined) from doing, whether singly or in concert, any of the following acts: (a) Ceasing or refusing to perform any work or to remain in any relations of employment; * * * (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertis-

ing, speaking, patroling, or by any other method not involving fraud or violence; (f) Assembling peaceably to act or to organize to act in promotion of their interests in labor disputes; . . ."

The Act reflects the realization that court interference at such a critical stage very often would destroy the Union's momentum and permanently settle the issue, even if the court decision later proved to be erroneous.

■ However, Section 301(a) of the Labor Management Relations Act (29 U.S.C. § 185(a)) demands an accommodation with Section 4 above, as defined in *Boys Markets v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), recently interpreted in *Buffalo Forge Company v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). This accommodation is based on the federal labor policy favoring arbitration and enforcement of a bargain between the parties to submit certain disputes to arbitration. Thus, under *Boys Markets* and *Buffalo Forge*, in addition to the general principles of equity, before an injunction can issue the court must first be satisfied that:

1. A collective bargaining agreement binds the parties and that the strike is in breach of a no-strike obligation in that agreement; and

2. The strike is over a dispute which the parties are bound to arbitrate under the agreement.

*Buffalo Forge, supra.*

■ Clearly, then, not all strikes may be enjoined, even if they are in violation of the collective bargaining agreements and the union may ultimately be liable in damages for its breach. Furthermore, the Norris-LaGuardia Act requires full testimony and specific findings before entry of injunction whenever the circumstances permit (See 29 U.S.C. § 107), and if the court does determine the strike is enjoinable and the equities require its injunction, the court's injunction order must be coupled with an order that the company arbitrate the dispute forthwith. *Boys Markets, supra.*

The Companies here argue that this matter falls within the *Boys Markets* exception, and the Court therefore has jurisdiction to provide the equitable relief sought. They claim that the applicable BLAs in each instance contain mandatory grievance-arbitration provisions and unqualified no-strike clauses, and that these negotiation disputes are susceptible to arbitration under those provisions in the existing contracts. The Steelworkers contend they are not in violation of the contracts, and, even if they were, the underlying disputes are not arbitrable under the existing contracts and the Court lacks jurisdiction to enjoin the strikes.

The crux of the jurisdictional question, then, is whether the strikes authorized would be "precipitated by a dispute between union and management that was subject to binding arbitration under the provisions of the contract." *Buffalo Forge, supra*, 428 U.S. at 406, 96 S.Ct. at 3146, 49 L.Ed.2d at 1030. The grievance-arbitration provisions of the various plant contracts here involved are typified by the provisions in the 1974 BLA applicable to United States Steel Corporation. The agreement states in pertinent part:

". . . The provisions of this Agreement constitute the sole procedure for the processing and settlement of any claim by an employee or the Union of a violation by the Company of this Agreement. As the representative of the employees, the Union may process complaints and grievances through the complaint and grievance procedure, including arbitration, in accordance with this Agreement or adjust or settle the same. [Paragraph 0.2]

"The Union (its officers and representatives, at all levels) and all employees are bound to observe the provisions of this Agreement." [Paragraph 4.2]

"There shall be no strikes, work stoppages or interruption or impeding of work. No officer or representative of the Union shall authorize, instigate, aid, or condone any such activities. No employee shall participate in any such activities." [Paragraph 4.7]

"The applicable procedures of the Agreement will be followed for the settlement of all complaints or grievances." [Paragraph 4.8]

"There shall be no lockouts." [Paragraph 4.14]

"All complaints or grievances shall be considered carefully and processed promptly in accordance with the applicable procedures of this Agreement." [Paragraph 4.15]

The Companies contend that these grievance-arbitration provisions are broad enough that many of the demands raised at the local level were susceptible to this mandatory procedure. The difficulty with their position is that the agreement, in reference to the grievance arbitrator's jurisdiction, also provides:

"The Board shall have jurisdiction and authority only to interpret, apply or determine compliance with the provisions of this Agreement and such local working conditions as may hereafter be in effect in the mines of the Company, insofar as shall be necessary to the determination of grievances appealed to the Board. The Board shall not have jurisdiction or authority to add to, detract from, or alter in any way the provisions of this Agreement."

The grievance-arbitration procedure in the BLAs is designed to resolve disputes about existing rights arising out of that contract, and the disputes herein question arise out of demands for new rights in future contracts.

The Companies attempt to get around this problem by arguing that the Court cannot say with positive assurance that these demands would "add to, detract from, or alter in any way" the existing agreement. Therefore, the complaints must be processed through the grievance-arbitration procedure (Citing *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp.*, 283

F.2d 93 (3rd Cir. 1960)), even though at each stage of the process the Company would argue as a defense that the complaint would alter the existing contract, is not a proper grievance, and must be dismissed.

An example of an issue asserted by the Companies to be arbitrable under the BLAs is the demand for incentive coverage in the iron ore operations, the issue most adamantly pressed by the Locals and apparently a central issue in this lawsuit. Pursuant to a previous interest arbitration decision, 85% of the Steelworkers were included under incentive coverage, creating a disparity in the amount of pay between covered and non-covered employees. Non-covered employees were given bonuses of 10 ¢ per hour in the steel industry and 20 ¢ per hour in the iron ore industry in their 1974 contracts, but this did not approach the approximated 85 ¢ per hour covered employees would receive.

The issue arose in industry-wide negotiations in 1977 and was also entered at the local plant level. As the deadline for industry-wide negotiations approached, the Company made a final offer of 30 ¢ per hour under the bonus plan, in lieu of incentive coverage for the iron ore workers. This offer was accepted, and all industry-wide issues were settled.

The iron ore locals continued to press the incentive coverage issue at the local level. The Companies assert that not only does this violate their agreement not to strike over non-local issues under ENA–77, but the incentive coverage issue was also arbitrable under the applicable BLAs. In some of the iron ore operation contracts, the decision as to whether or not to implement incentive coverage was left to the discretion of the local plant under its BLA; in others there is no mention of incentive coverage. The Companies therefore argue they are not positively assured that incentive coverage is not a right arising out of the applicable BLA, and the BLAs' grievance-arbitration procedure must be ordered to resolve the issue.[5]

---

5. The Companies point out that the mere fact that a company could not initiate the griev-

ance-arbitration process, as a company is unable to do here, would not of itself preclude the

However, the Union has never contended during negotiations that the incentive coverage it seeks for iron ore miners is due them under the terms of all or any of the BLAs, and that the respective employers have therefore breached their agreements. Had they done so, they would have been met by arbitration awards holding that grievances seeking incentive coverage were "not arbitrable" or were beyond the arbitrator's "authority". Bethlehem Steel Corporation (Sparrows Point), Vol. 14, Steel Arbitration 10,689 (Porter, 1967); Jones & Laughlin Steel Corporation (Pittsburgh Works), Vol. 10, Steel Arbitration 6841 (Alexander, 1961); Jones & Laughlin Steel Corporation (Aliquippa), Vol. 3, Steel Arbitration 2041 (Cahn, 1953). On the contrary, what the Union has said is that they are prepared to strike for incentive coverage to be included in their new contracts as a matter of fundamental fairness and equity. The BLAs' grievance-arbitration procedures were simply not intended to become interest arbitration arenas, and these strikes in support of negotiation demands are thus not "precipitated" over issues which the Union is bound to arbitrate under the BLAs.

We must note that the Companies do not contend that the binding interest arbitration provision in ENA–77 provides the mandatory arbitration procedure which would give this Court jurisdiction to enjoin the strikes.[6] They rely solely on the BLAs' provisions. We therefore conclude that, as in *Buffalo Forge*, the strikes here will not be over arbitrable disputes and for that reason are not within the *Boys Markets* exception to Section 4 of the Norris-La-Guardia Act.

This conclusion is compelled despite our finding that the imminent strikes will violate the no-strike provision of the ENA–77, Section A, and that the equities in the case would otherwise compel injunctive relief. All of the strike ballots here challenged contained issues that were not "local collective bargaining issues" as defined in the ENA–77, Section D–5–a. The 21 Iron Ore Locals are attempting to strike over a least one issue—incentive coverage—which was bargained for at the national level and if implemented would be inconsistent with, add to, and modify the Settlement–77 provisions for bonus pay given in lieu of incentive coverage. The issue is therefore not local as defined in Section D–5–a, and strikes in support thereof would violate the no-strike clause of the ENA–77. The three steel subsidiaries likewise considered issues in the strike vote which would not meet Section D–5–a. If one or more issues considered in the strike vote were improper, the whole vote is tainted and in violation of the ENA–77 procedure. *Cf. National Labor Relations Bd. v. Denver Building & Construction Trades Council*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); *Refrigeration Contractors, Inc. v. Local Union 211 of the United Association of Journeymen and Apprentice of the Plumbing and Pipefitting Industry*, 501 F.2d 668 (5th Cir. 1974); *Wilson v. Milk Drivers and Dairy Employees Union, Local 471*, 491 F.2d 200 (8th Cir. 1974); *Brown Transport v. National Labor Relations Board*, 334 F.2d 30 (5th Cir. 1964); *National Labor Relations Board v. Local 182, International Brotherhood of Teamsters*, 314 F.2d 53 (2nd Cir. 1963); *National Labor Relations Board v. Wine, Liquor & Distillery Workers Union*, 178 F.2d 584 (2nd Cir. 1949); *Kaynard v. Local 25, International Brotherhood of Electrical Workers, AFL–CIO*, 367 F.Supp. 1065 (E.D. N.Y.1973); and *McLeod v. Hempstead Local No. 1921, United Brotherhood of Carpenters & Joiners of America, AFL–CIO*, 183 F.Supp. 494 (E.D.N.Y.1960).

Court from holding that the issue is arbitrable and granting an injunction, citing *Avco Corp. v. Local Union # 787 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)*, 459 F.2d 968 (3rd Cir. 1972).

**6.** Both parties contend that all non-local issues have been settled. For a discussion of enforcement of interest arbitration agreements under Section 301(a), see Note, The Enforceability of Interest Arbitration Agreements Under Section 301(a) of the Labor Management Relations Act, 27 Syr.L.Rev. 985 (1976).

Furthermore, the testimony clearly revealed that the strikes were imminent and the anticipated damage considerable and irreparable. The Union stipulated that the strikes were voted for at the plant level and authorized by the International President, and in its testimony admitted that there is little doubt that most of the 24 Locals will walk out on August 1, 1977. Such an imminent irreparable injury would be enjoinable. *United States Steel Corporation v. United Mine Workers of America*, 534 F.2d 1063, 1077 (3rd Cir. 1976); *Cf. Boys Markets, supra*. When every preliminary step to strike has been taken and everyone expects the strike to occur, it would make little sense to compel the Plaintiffs to actually incur the threatened harm.

The strikes would also cause extensive financial losses, compel cut-backs throughout the steel industry if extended in duration, and cause steel customers some loss of faith in the ability of the Companies to avoid strikes under ENA–80.

Nevertheless, the Court must abide by the limitations of Section 4 of the Norris-LaGuardia Act and its interpretation in *Buffalo Forge, supra*. Perhaps the critical defect of ENA–77, which we again commend as having served its purpose well in the majority of the locations, is its failure to provide a procedure for mandatory arbitration of the definition of "local collective bargaining issue". We must, however,

point out that such a procedure would still not make strikes over non-local issues enjoinable because the underlying issues would remain not arbitrable under the BLAs as written.[7] But, the existence of such a provision might have eliminated the need for either party here to seek injunctive relief.

In summary, then, the Court finds:

1. The collective bargaining agreement contains an express or implied no-strike clause.

2. The breach of that clause is imminent and will be committed. It is clear that the Steelworkers intend to carry out the strike against the Plaintiff Companies.

3. The collective bargaining agreement does not contain mandatory grievance adjustment or arbitration procedures in the BLAs applicable to this situation.

4. The Plaintiff Companies were prepared to proceed with arbitration at the time the Injunction was sought.

5. The breach of the no-strike clause has caused and will cause irreparable harm to the Companies and the employer would suffer more from the denial of an injunction than the Union would suffer from its issuance; tremendous damage will be incurred by the Plaintiffs if an injunction is not issued, while the harm resulting to the Steelworkers would be only that which they bargained for.

---

**7.** The Court stated in *Buffalo Forge, supra*, 428 U.S. at 410, 96 S.Ct. at 3148:

"Here the Union struck, the parties were in dispute whether the sympathy strike violated the Union's no-strike undertaking. Concededly, that issue was arbitrable . . . However, it does not follow that the district court was empowered not only to order an arbitration to enjoin the strike pending the decision of the arbitrator, despite the express prohibition of Section 4(a) of the Norris-La-Guardia Act against injunctions prohibiting any person from '(c) easing or refusing to perfrom any work or to remain in any relation of employment'. If an injunction could issue against the strike in this case, so in proper circumstances could a court enjoin any other breach of contract pending exhaustion of the applicable grievance and arbitration provisions even though the injunction would otherwise violate one of the express

prohibitions of Section 4 . . . this would cut deeply into the policy of the Norris-LaGuardia Act and make the court's potential participation in a wide range of arbitrable disputes under the many existing and future collective bargaining contracts, not just for the purpose of enforcing promises to arbitrate, which was the limit of *Boys Markets*, but for the purpose of preliminarily dealing with the merits of the factual and legal issues that are subjects for the arbitrator and of issuing injunctions that would otherwise be forbidden by the Norris-LaGuardia Act.

This is not what the parties have bargained for. Surely it can not be concluded here, as it was in *Boys Markets*, that such injunctions pending arbitration are essential to carry out promises to arbitrate and to implement the private arrangements for the administration of the contract."

We can only conclude that the criteria of *Boys Markets* has not been satisfied and thus that the Court is not authorized to grant the injunctive relief as requested by the Plaintiffs. We cannot, as the Plaintiffs contend we should, limit *Buffalo Forge* to its facts, *i. e.*, limit it to sympathy strikes where the only arbitrable issue is the legality of the strike itself. *See : National Labor Relations Board v. Keller-Crescent Co.*, 538 F.2d 1291 (7th Cir. 1976). We have been pointed to a national policy favoring arbitration, but our Supreme Court has also strongly pointed out the policy that there shall be no specific enforcement of a no-strike clause unless the contract contains an arbitration clause which covers the underlying issues in dispute. *Buffalo Forge, supra.*

On the basis of the facts and discussion set forth above, the Court declines to enter an order granting Plaintiffs' request and directing arbitration of the other than "local" disputes, as defined in ENA–77, or enjoining the Steelworkers from engaging in a work stoppage in support of its bargaining demands, or directing the Steelworkers to withdraw its authorization permitting such strikes.

An appropriate Order will be entered.

### APPENDIX A (Exhibit D)

#### List of Locations and Dates Where Strikes Have Been Authorized by President of Defendant USW

| Company | Plant | Date of Authorization For Strike |
|---|---|---|
| Cleveland Cliffs Iron Company | Canisteo Mine | April 1, 1978 |
| Cleveland Cliffs Iron Company | Cliffs Electric Service Company | August 1, 1977 |
| Cleveland Cliffs Iron Company | District Maintenance Crew | August 1, 1977 |
| Cleveland Cliffs Iron Company | General Shops—Diamond Drills | August 1, 1977 |
| Cleveland Cliffs Iron Company | Empire Mine | August 1, 1977 |
| Cleveland Cliffs Iron Company | Mather Mine Ore Improvement Plant Pioneer Pellet Plant | August 1, 1977 |
| Cleveland Cliffs Iron Company | Republic and Humboldt Mines | August 1, 1977 |
| Cleveland Cliffs Iron Company | Tilden Mine | August 1, 1977 |
| Hanna Mining Company | Butler Taconite | August 1, 1977 |
| Hanna Mining Company | Groveland Mine | August 1, 1977 |
| Hanna Mining Company | National Steel Pellet Company | August 1, 1977 |
| Hanna Mining Company | Whitney Mine | August 1, 1977 |
| Inland Steel Company | Carnegie Plant of Joseph T. Ryerson Div. | August 1, 1977 |
| Inland Steel Company | Cleveland Plant of Joseph T. Ryerson Div. | August 1, 1977 |
| Inland Steel Company | Inland Lime and Stone Division | August 1, 1977 |
| Inland Steel Company | Minorca Mine Plant | August 1, 1977 |
| Jones & Laughlin Steel Corporation | Minnesota Ore Operations | April 1, 1978 |
| National Steel Corporation | Donner-Hanna Coke Corporation | August 1, 1977 |
| Oglebay-Norton Taconite Company | Eveleth, Minnesota | August 1, 1977 |
| Pickands Mather and Company | Erie Mining Company | August 1, 1977 |
| Pickands Mather and Company | Hibbing Taconite | August 1, 1977 |
| Republic Steel in Hamilton, Ontario | Union Drawn Plant | August 1, 1977 |
| Reserve Mining Company | Silver Bay and Babbitt, Minnesota | August 1, 1977 |

| Company | Plant | Date of Authorization For Strike |
|---|---|---|
| U. S. Steel Corporation | Atlantic City Ore Operations | September 15, 1977 |
| U. S. Steel Corporation | Electric Cable Plant | August 1, 1977 |
| U. S. Steel Corporation | Minnesota Ore Operations | August 1, 1977 |